



IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

ARTICHOKE JOE'S, CALIFORNIA
GRAND CASINO, FAIRFIELD YOUTH
FOUNDATION, LUCKY CHANCES,
INC., OAKS CLUB ROOM,
SACRAMENTO CONSOLIDATED
CHARITIES,

     Plaintiffs,

     v.

GALE A. NORTON, JAMES MCDIVITT,
GRAY DAVIS, BILL LOCKYER,
HARLAN W. GOODSON, JOHN E.
HENSLEY, MICHAEL C. PALMER,
J.K. SASAKI, ARLO SMITH,

     Defendants.

CIV-S-01-0248 DFL GGH

MEMORANDUM of OPINION AND
ORDER

     Plaintiffs challenge the validity of compacts entered into under the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. §§ 2701 et seq., between the State of California and certain Indian tribes.  The compacts permit the tribes to offer Las Vegas style high stakes gaming, including slot machines.  The compacts were specifically authorized by a California constitutional amendment, Proposition 1A, which gives the Governor the authority "to

1

negotiate and conclude compacts . . . for the operation of slot machines and for the conduct of lottery games and banking card games by federally recognized Indian tribes on Indian lands in California." Cal. Const. Art. IV, sec. 19(e).  The plaintiffs are California card clubs and charities who are prohibited under state law from offering similar sorts of gambling, and thus have been placed at a competitive disadvantage.  Plaintiffs allege that the defendants, various state and federal officers, including the Governor and the Secretary of the Interior, violated IGRA and the Fifth and Fourteenth Amendments to the United States Constitution by creating a tribal monopoly on Las Vegas style gaming.  Plaintiffs seek both declaratory and injunctive relief to invalidate the existing compacts and to block the execution of any future compacts.  The state and federal defendants contend that the court lacks jurisdiction to hear the plaintiffs' claims and that neither Proposition 1A nor the compacts violate federal law.  On cross-motions for summary judgment, the court finds that it has jurisdiction over most of the plaintiffs' claims and further finds that neither the compacts nor Proposition 1A violate federal law.

Because of the opinion's length and the wide range of issues addressed, the court provides the following summary.  On the standing issues, the court has jurisdiction to resolve the claims against the federal defendants, the claims against the Governor related to existing compacts, and the claims against the State Attorney General and the Director of the California Division of

2

1  Gambling Control as to the enforcement of state gaming laws

2  against plaintiffs.  The court concludes that as to count II,

3  brought against the state defendants as to existing and future

4  compacts, plaintiffs have demonstrated an injury in fact with

5  respect to the Governor and the existing compacts.  However, they

6  fail to demonstrate an immediate and imminent threat of harm from

7  possible future compacts, and thus, are not entitled to seek

8  equitable relief as to any future compacts, including potential

9  compacts involving the Lytton Rancheria under count III.  Also as

10 to count II, the plaintiffs have established that the Governor's

11 conduct caused their alleged injuries and that a favorable ruling

12 would redress their alleged harms.  Further, they have

13 established causation and redressability as to the Attorney

14 General and the Director, but not the Commission, under count IV

15 which seeks to enjoin enforcement of California Penal Code

16 provisions prohibiting plaintiffs and others from engaging in Las

17 Vegas style gambling.  The court further concludes that it has

18 jurisdiction over the Governor, Attorney General, and the

19 Director under Ex parte Young, 209 U.S. 123 (1908).

20     As to count I, which is brought against the federal

21 defendants, the court concludes that plaintiffs may bring a claim

22 to enforce IGRA and the Johnson Act under § 701(a)(1) of the

23 Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 et seq.

24 Further, because matters related to the approval of tribal gaming

25 compacts are not committed by law to agency discretion,

26 plaintiffs' claims are not precluded by § 701(a)(2) of the APA.

3

The court also concludes that the plaintiffs fall within the zone of interests arguably sought to be protected by IGRA and the Johnson Act.  Finally, because the legal interests of California's Indian tribes are adequately represented by the Secretary of the Interior, the tribes are not necessary and indispensable parties under Fed. R. Civ. P. 19.

With respect to the merits of the case, the court holds that the class III gaming compacts are valid under IGRA and the Constitution.  Because California law through Proposition 1A permits class III gaming for Indian tribes with compacts, it satisfies IGRA's requirement that the state "permit" class III gaming "for any purpose by any person, organization, or entity." 25 U.S.C. § 2710(d)(1)(B).  The court finds that this statutory language cannot reasonably be understood to condition class III Indian gaming on the state's permission of class III gaming to all persons for any purpose.  If this were the proper interpretation, IGRA would be a virtual nullity because no state would ever grant class III gaming privileges to all comers for any purpose.  Rather, the language is best understood to open the way to class III Indian gaming if the state grants permission to any one group or person, including Indian tribes.  For these reasons, the court concludes that the defendants are in compliance with IGRA and the Johnson Act.

The court further finds that the tribal class III gaming monopoly does not discriminate on the basis of race.  Under well established Supreme Court precedent, "[f]ederal regulation of

4

1  Indian tribes . . . is governance of once-sovereign political

2  communities; it is not to be viewed as legislation of a 'racial'

3  group consisting of 'Indians' . . . ." United States v.

4  Antelope, 430 U.S. 641, 646 (1977) (quoting Morton v. Mancari,

5  417 U.S. 535, 553 n.24 (1974)).  So long as the compacts are

6  rationally related to Congress' trust obligation to the tribes,

7  the compacts will not be set aside on constitutional grounds.

8  Because the compacts, including the monopoly on class III gaming,

9  promote tribal economic development, they are rationally related

10 to Congress' trust obligations and do not violate equal

11 protection.

12     This case presents significant, complex legal issues against

13 a background of even more important and complex policy questions.

14 Those policy questions must be resolved by the political branches

15 and the electorate.  The court decides only that the state and

16 federal defendants did not violate federal law by entering into

17 the compacts at issue.

18                    I.   Facts and Procedural History

19 A.   Indian Gaming Regulatory Act

20     The Indian Gaming Regulatory Act was enacted by Congress in

21 1988 shortly after the Supreme Court's decision in California v.

22 Cabazon Band of Mission Indians, 480 U.S. 202 (1987).  In Cabazon

23 the Court invalidated California's regulation of Indian bingo on

24 the ground that such regulation was civil rather than criminal in

25

26

nature and therefore was not authorized by Public Law 280.[1]  As a practical result of Cabazon, Indian tribes were free to offer gaming on tribal lands subject only to federal regulation or to state criminal prohibitions.  Although Congress had been considering bills to regulate Indian gaming for several years, Cabazon left something of a regulatory vacuum that made the issue of Indian gaming regulation more pressing.[2]

IGRA was Congress' compromise solution to the difficult questions involving Indian gaming.  The Act was passed in order to provide "a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments" and "to shield [tribal gaming] from organized crime and other corrupting influences to ensure that the Indian tribe is the

---

[1]   Public Law 280 permits certain states, including California, to exercise criminal jurisdiction over Indian lands. Public Law 280 provides in relevant part:
> Each of the States . . . listed in the following table shall have jurisdiction over offenses committed by or against Indians in the areas of Indian country listed . . . to the same extent that such State . . . has jurisdiction over offenses committed elsewhere within the State . . ., and the criminal laws of such State . . . shall have the same force and effect within such Indian country as they have elsewhere within the State.

18 U.S.C. § 1162(a).

[2]   The first bills to regulate Indian gaming were introduced in the 98th Congress, H.R. 4566 and H.R. 6390.  Five bills were subsequently introduced in the 99th Congress, H.R. 1920, H.R. 3752, H.R. 2404, S. 2557, and S. 902.  In the 100th Congress, S. 555 was introduced shortly before the Court's decision in Cabazon, and was followed by S. 1303 and S. 1841, in the Senate, and in the House, by H.R. 1079, H.R. 964, H.R. 2507, and H.R. 3605.

primary beneficiary of the gaming operation."   25 U.S.C. §

2702(1), (2).   IGRA is an example of "cooperative federalism" in

that it seeks to balance the competing sovereign interests of the

federal government, state governments, and Indian tribes, by

giving each a role in the regulatory scheme.   See New York v.

United States, 505 U.S. 144, 167-68 (1992) (collecting examples

of cooperative federalism).

IGRA functions by dividing gaming into three categories and

intensifying the level of regulatory oversight depending on the

category of gaming.   "Class I gaming" includes social games with

prizes of minimal value, as well as traditional forms of Indian

gaming, and is subject to exclusive regulation by Indian tribes.

25 U.S.C. §§ 2703(6), 2710(d).   "Class II gaming" includes bingo

and card games explicitly authorized by the State, or not

explicitly prohibited by the State if such games are actually

played in the State, but does not include any banking card games

or slot machines.[3]   Id. § 2703(7)(A).   Class II gaming is subject

to joint regulation by the federal government and tribal

authorities.   Id. § 2710(d).

Class III gaming is defined as all forms of gaming that "are

not class I gaming or class II gaming."   Id. § 2703(8).   Class

III gaming includes parimutuel horse race wagering, lotteries,

---

[3]   In banked or percentage card games, players bet against
the "house" or the casino.   In "nonbanked" or "nonpercentage"
card games, the "house" has no monetary stake in the game itself,
and players bet against one another.   (Eadington Decl. at ¶ 13).
Banked or percentage card games include the types of gaming
generally associated with Atlantic City or Las Vegas.

banking card games, slot machines, and all games with non-Indian origins.[4]  Class III gaming is only lawful on Indian lands if three conditions are met[5]: (1) approval by the governing body of the Tribe and the Chairman of the National Indian Gaming Commission ("NIGC"); (2) permission by the state, in the sense that the state permits "such gaming," "for any purpose by any person"; and (3) existence of a Tribal-State compact that is approved by the Secretary of the Interior.[6]

The Tribal-State compact is the key to class III gaming under IGRA.  Under such a compact, the federal government cedes

---

[4]  Slot machines were developed in the late 19th century and had their origins in saloons.  (Id. at ¶ 54).  Blackjack was derived from French and Italian card games.  (Id. at ¶ 55).

[5]  The statute provides that class III Indian gaming must be:
> (A) authorized by an ordinance or resolution that--
> (i) is adopted by the governing body of the Indian tribe having jurisdiction over such lands,
> (ii) meets the requirements of subsection (b) of this section, and
> (iii) is approved by the Chairman [of the National Indian Gaming Commission],
> (B) located in a State that permits such gaming for any purpose by any person, organization, or entity, and
> (C) conducted in conformance with a Tribal-State compact entered into by the Indian tribe and the State under paragraph (3) that is in effect.

25 U.S.C. § 2710(d)(1).

[6]  The Secretary of the Interior has 45 days to approve or disapprove a compact, or the compact is deemed approved "to the extent the compact is consistent with [IGRA]."  Id. § 2710(8)(D).  The Secretary may disapprove a compact if it violates IGRA, any other provision of federal law, or "the trust obligations of the United States to Indians."  Id. § 2710(8)(B).

1   its primary regulatory oversight role over class III Indian

2   gaming, and permits states and Indian tribes to develop joint

3   regulatory schemes through the compacting process.[7]  In this way,

4   the state may gain the civil regulatory authority that it

5   otherwise lacks, and a tribe gains the ability to offer class III

6   gaming.[8]  See Keweenaw Bay Indian Community v. United States, 136

7   F.3d 469, 472 (6th Cir. 1998).  IGRA provides that the Tribal-

8   State compact may include provisions relating to a number of

9   issues that arise once class III gaming begins, including the

10  application of state criminal and civil laws, the allocation of

11  jurisdiction between the state and the tribe necessary for the

12  enforcement of gaming laws, and the assessment by the State of

13

14

---

15      [7]  IGRA also added 18 U.S.C. § 1166 which states that "for
16  purposes of Federal law, all State laws pertaining to the
    licensing, regulation, or prohibition of gambling, including but
17  not limited to criminal sanctions applicable thereto, shall apply
    in Indian country in the same manner and to the same extent as
18  such laws apply elsewhere in the State."  Section 1166(d) gives
    the United States "exclusive jurisdiction over criminal
19  prosecutions of violations of State gambling laws that are made
    applicable under this section to Indian country, unless an Indian
20  tribe pursuant to a Tribal-State compact approved by the
    Secretary of the Interior under section 11(d)(8) of the Indian
21  Gaming Regulatory Act . . . has consented to the transfer to the
    State of criminal jurisdiction with respect to gambling on the
22  lands of the Indian tribe."  18 U.S.C. § 1166(d).

23      [8]  Separately, IGRA includes a waiver of the Johnson Act, 15
    U.S.C. § 1175(a), which prohibits the use of gambling devices,
24  including slot machines, within Indian country.  IGRA's waiver
    provision states that the Johnson Act "shall not apply to any
25  gaming conducted under a Tribal-State compact that–
        (A) is entered into under paragraph (3) by a State in which
26  gambling devices are legal, and
        (B) is in effect."
    25 U.S.C. § 2710(d)(6).

gaming activities in order to defray the costs of regulation.[9]

The compacting process begins when a tribe requests negotiations with the state in which its lands are located.  Id. § 2710(3)(A).  IGRA provides jurisdiction in the federal courts to hear a claim by a tribe that a state has failed to negotiate in "good faith."[10]  Id. § 2710(d)(7)(A).  If a court finds that a state failed to negotiate in good faith, IGRA permits the court to order the state and the tribe to conclude a compact within 60 days.  Id. § 2710(d)(7)(B)(iii).  If the parties are unable to agree to a compact within this period of time, IGRA directs the parties to submit their "last best offer for a compact" to a mediator who will then select the more appropriate plan.  Id. § 2710(d)(7)(B)(iv).  In determining whether a state negotiated in good faith, IGRA permits courts to "take into account the public interest, public safety, criminality, financial integrity, and adverse economic impacts on existing gaming activities."  Id. § 2710(d)(7)(B)(iii)(II).[11]

Finally, IGRA explicitly prohibits gaming on lands taken

---

[9]  Except for these assessments, states may not otherwise impose "any tax, fee, charge, or other assessment upon an Indian tribe or upon any other person or entity authorized by an Indian tribe to engage in a class III activity."  Id. § 2710(4).

[10]  Although the Court invalidated this provision of IGRA in Seminole Tribe of Florida v. Florida, 517 U.S. 44 (1996), on the ground that it violated the Eleventh Amendment and state sovereign immunity, the State of California has consented to such suits by waiving its immunity.  Cal. Gov't Code § 98005.

[11]  IGRA also permits federal courts to consider "any demand by the State for direct taxation of the Indian tribe or of any Indian lands as evidence that the State has not negotiated in good faith."  25 U.S.C. § 2710(d)(7)(B)(iii)(II).

1  into trust for the benefit of a tribe after October 17, 1988.

2  Id. § 2719(a).  This restriction does not apply, however, if the

3  Secretary, having consulted with tribal and state and local

4  officials, and having secured the agreement of the Governor,

5  determines that gaming on the newly acquired lands would benefit

6  the tribe and would not be detrimental to the surrounding

7  community.[12]  Id. § 2719(b).

8  B.  California Gaming

9    Following the enactment of IGRA, the State of California and

10  various Indian tribes in California attempted to conclude Tribal-

11  State compacts.  However, the State and the tribes disagreed

12  about the forms of gaming that would be permitted and the content

13  of the compacts.  See, e.g., Rumsey Indian Rancheria of Wintun

14  Indians v. Wilson, 64 F.3d 1250 (9th Cir. 1996); Hotel Employees

15  and Rest. Employees Int'l Union v. Davis, 21 Cal. 4th 585 (1999).

16  These disagreements were ultimately settled, and on September 10,

17  1999, Governor Davis approved fifty-seven class III gaming

18  compacts on behalf of the State of California.  (Complaint at ¶

19  39).  The compacts, which are effective until December 31,

20

21    [12]  Section 2719(b) also states that the restriction on

22  gaming on lands acquired after October 17, 1988 does not apply
   when:

23      (B) lands are taken into trust as part of--
       (i) a settlement of a land claim,

24      (ii) the initial reservation of an Indian
   tribe acknowledged by the Secretary under the

25  Federal acknowledgment process, or
       (iii) the restoration of lands for an

26  Indian tribe that is restored to Federal
   recognition.
   Id. § 2719(b)(1).

2020,[13] are identical in most respects.  The compacts point to the preferred position accorded to the tribes, noting that the compacts "create a unique opportunity for [each] Tribe to operate its Gaming Facility in an economic environment free of competition from the Class III gaming . . . on non-Indian lands in California."  (Tribal-State Compact Between the State of California and the Augustine Band of Mission Indians ("Compact"), at 2, § 11.2.1(a), Exh. 1 to St. Defs.' App. of Authorities).

The compacts permit each signatory tribe to operate "gaming devices" or slot machines, banking or percentage card games, and any devices or games that the California State Lottery is authorized to offer.  Id. at § 4.1.  The tribe may initially operate up to 350 slot machines, but, by participating in a series of draws, a tribe may acquire licenses to operate up to 2,000 slot machines.  Id. at §§ 4.3.1, 4.3.2.2.  The tribe must, however, pay a one-time non-refundable fee of $1,250 for each gaming device it operates that goes into a "Revenue Sharing Trust Fund," which distributes up to $1.1 million per year to tribes without compacts.  Id. at §§ 4.3.2.1, 4.3.2.2(3).[14]

---

[13]   The compacts permit a signatory tribe to terminate a compact "in the event the exclusive right of Indian tribes to operate Gaming Devices in California is abrogated."  (Compact at § 12.4).

[14]   Tribes with compacts must also make yearly payments into the Fund according to a graduated formula that increases the amount that each tribe must contribute annually per device up to $4350.  Id. at § 4.3.2.2(2).  Separately, the compacts create a "Special Distribution Fund" comprised of payments made by tribes of between 0% and 13% of the gaming device winnings.  Id. at § 5.1.  Revenue deposited into the Special Distribution Fund is available for appropriation by the Legislature for prescribed

1    Two agencies, the "Tribal Gaming Agency" and the "State

2  Gaming Agency," are responsible for the bulk of regulatory

3  oversight under the compacts.  The Tribal Gaming Agency is

4  defined as the intertribal gaming regulatory agency designated to

5  carry out the signatory Tribe's regulatory responsibilities, and

6  it has primary responsibility for the on-site regulation of

7  Indian gaming.[15]  Id. at §§ 2.20, 7.0.  The State Gaming Agency,

8  defined as the "entities authorized to investigate, approve, and

9  regulate gaming licenses" under Cal. Bus. & Profs. Code § 19800

10  et seq., includes the California Gambling Control Commission and

11  the Division of Gambling Control in the California Department of

12  Justice.[16]  Id. at § 2.18; Cal. Bus. & Profs. Code §§ 19809,

13  19810A.  Members of the Commission are appointed by the Governor,

14  subject to confirmation by the State Senate, and serve four year

15  terms.  Cal. Bus. & Profs. Code § 19812A.

16  ────────────────────

17  purposes including payments to state agencies for expenses
related to Indian gaming.

18      [15]  The compacts state that the
19          "Tribal Gaming Agency" means the person,
           agency, board, committee, commission, or
20          council designated under tribal law . . . to
           fulfill those functions by the National Indian
21          Gaming Commission, as primarily responsible
           for carrying out the Tribe's regulatory
22          responsibilities under IGRA and the Tribal
           Gaming Ordinance.  No person employed in, or
23          in connection with the management,
           supervision, or conduct of any gaming activity
24          may be a member or employee of the Tribal
           Gaming Agency.
25  Compact at § 2.20.

26      [16]  The California Gambling Control Commission also
administers the Revenue Sharing Trust Fund.  (Compact at ¶
4.3.1(a)(ii)).

1   As part of its regulatory function, the Tribal Gaming Agency
2   may promulgate rules and regulations governing the management and
3   operation of tribal gaming facilities, although its regulations
4   must be consistent with the State Gaming Agency's statewide
5   rules.  Compact at §§ 8.1, 8.4.  In certain circumstances, the
6   State Gaming Agency may also promulgate rules directly applicable
7   to Indian gaming facilities.  Id. at § 8.4.1.

8   As part of its regulatory oversight, the Tribal Gaming
9   Agency licenses all Indian gaming facilities and all persons who
10   work in and with them.  Id. at § 6.4.1.  However, subject to a
11   variety of exceptions, a person who has been denied a
12   determination of suitability by the State Gaming Agency may not
13   work in or with a gaming facility.  Id. at §§ 6.4.4(c), 6.4.5.
14   Further, except for "non-key Gaming Employee[s]," the Tribal
15   Gaming Agency must require license applicants to file an
16   application with the State Gaming Agency for a determination of
17   suitability for licensure under the California Gambling Control
18   Act.  Id. at § 6.5.6.  The Tribal Gaming Agency is also charged
19   with inspecting class III gaming facilities to determine if they
20   are in compliance with IGRA, the governing compact, and the
21   Agency's regulations, although the State Gaming Agency may also
22   conduct inspections of its own.  Id. at § 7.0.

23   Finally, the compacts specify three conditions that must be
24   met before they become effective.  The compacts must be ratified
25   by the State Legislature and be approved by the United States
26   Secretary of the Interior ("Secretary").  Also, because

California prohibits class III gaming under Cal. Cons. Art. IV, sec. 19(e), and Cal. Penal Code §§ 330, 330a, 330b, California voters must approve the California Senate's proposed Constitutional Amendment 11 ("Proposition 1A"), that would permit the Governor to enter into class III gaming compacts, thereby exempting Indian tribes from the general prohibition on gaming. Id. at § 11.1.

All three conditions have been satisfied.  In September 1999, the California Legislature ratified the fifty-seven compacts that were signed by the Governor on September 10, 1999, and enacted provisions to expedite the approval of additional identical compacts.[17]  Cal. Gov't Code § 12012.25.  On March 7, 2000, California voters approved Proposition 1A which amended the

---

[17]  California Gov't Code § 12012.25 provides:
(b) Any other tribal-state gaming compact entered into between the State of California and a federally recognized Indian tribe which is executed after September 10, 1999, is hereby ratified if both of the following are true:
(1) The compact is identical in all material respects to any of the compacts expressly ratified pursuant to subdivision (a).  A compact shall be deemed to be materially identified to a compact ratified pursuant to subdivision (a) if the Governor certifies it is materially identical at the time he or she submits it to the Legislature.
(2) The compact is not rejected by each house of the Legislature, two-thirds of the membership thereof concurring, within 30 days of the date of the submission of the compact to the Legislature by the Governor.  However, if the 30-day period ends during a joint recess of the Legislature, the period shall be extended until the fifteenth day following the day on which the Legislature reconvenes.

California Constitution as follows:

> Notwithstanding subdivisions (a) and (e), and any other provision of state law, the Governor is authorized to negotiate and conclude compacts, subject to ratification by the Legislature, for the operation of slot machines and for the conduct of lottery games and banking card games by federally recognized Indian tribes on Indian lands in California in accordance with federal law.

Cal. Const. Art. IV, sec. 19(e).  On May 5, 2000, the Assistant Secretary of Indian Affairs, approved the compacts on behalf of the Secretary of the Interior, expressly finding that "[t]he Governor can, consistent with the State's amended Constitution, conclude a compact giving an Indian tribe, along with other California Indian tribes, the exclusive right to conduct certain types of Class III gaming."  (Letter from Kevin Grover, May 5, 2000, Exh. B to Complaint).  The Secretary's approval was published in the Federal Register on May 16, 2000.  (Notice of approved Tribal-State Compacts, 65 Fed. Reg. 31,189 (May 16, 2000)).

Since the first 57 compacts became effective, five additional compacts have been entered into by the Governor and approved by the Secretary.  (Notice of approved Tribal-State Compact, 65 Fed. Reg. 41721 (July 6, 2000); Notice of approved Tribal-State Compact, 65 Fed. Reg. 62749 (October 19, 2000); Pls.' Resp. to State Defs.' Statement of Undisputed Facts ("SUF") at ¶ 15).  Further, at least two additional tribes have requested class III gaming compacts, but their requests have been placed on hold by the State until the conclusion of this lawsuit.  (See

Shelley Anne Chang Letters, May 2, 14, 2001, Exhs. K, L to Pls.'
Reply).  Thirty-nine of the 62 tribes with compacts currently
operate casinos with slot machines, 18 of which are located in
Northern California.  Some 44 California tribes remain without
compacts.  (Eadington Decl. at ¶¶ 3, 4).[18]

C.    The Lytton Band

On March 22, 1991, the Lytton Rancheria, a tribe previously
terminated by the federal government under Pub. L. 85-671, 72
Stat. 619, was reinstated according to the terms of a stipulation
entered into between the Tribe, the United States, and the County
of Sonoma where the Tribe's lands historically were located.
(Indians of the Sugar Bowl Rancheria, et al. v. United States,
No. C-86-3660 (N.D. Cal. Mar. 22, 1991) (Stipulation for Entry of
Judgment), Exh. G to State Defs.' Motion to Dismiss; Notice of
Reinstatement, 57 Fed. Reg. 5214-01 (Feb. 12, 1992)).  The
stipulation included provisions which permitted the Secretary of
the Interior to take land into trust for the then landless
Rancheria in the Alexander Valley in Sonoma County.  (Id. at ¶
5).

Following the Lytton Rancheria's reinstatement, the Tribe
acquired land in San Pablo in Contra Costa County, less than 20
miles from downtown San Francisco.  (Eadington Decl. at ¶ 6).
Although the Rancheria has not yet requested negotiations to
conclude a gaming compact with respect to this land, (Pls.' Resp.

---

[18]   The state defendants' objections to evidence, including
to the Eadington declaration, are denied.

to State Defs.' SUF at ¶ 24), in September, 1999, it entered into a Municipal Services Agreement with the City of San Pablo stating that the Rancheria "intends to enter into a compact with the State of California ("State") which provides for the joint exercise of jurisdiction of the Band and the State to regulate gaming on the Property pursuant to the IGRA." (Municipal Services Agreement at 2, Exh. J to Pls.' Exhs. to Motion).

However, because the San Pablo land was not acquired until 1999, it fell under 25 U.S.C. § 2719's restriction on class III gaming on lands acquired after October 17, 1988, and the Lytton Tribe could not offer gaming on the San Pablo tract unless it satisfied one of the exceptions enumerated in § 2719(b).  On December 27, 2000, the Omnibus Indian Advancement Act of 2000, Pub. L. 106-568, Stat. 2868, went into effect.  (Complaint at ¶ 52).  Section 819 of the Act ("San Pablo Legislation"), which was passed without hearings or debate, (Pls.' SUF at ¶ 18; Complaint at ¶ 53), effectively "backdated" acquisition of the Lytton Rancheria's land in San Pablo prior to October 17, 1988.[19]  Thus, if the Lytton Rancheria seeks to conclude a class III gaming

---

[19]   Section 819 provides:
> Notwithstanding any other provision of law, the Secretary of the Interior shall accept for the benefit of the Lytton Rancheria of California the land described in that . . . grant deed dated . . . October 16, 2000 . . . . The Secretary shall declare that such land is held in trust by the United States for the benefit of the Rancheria . . . . Such land shall be deemed to have been held in trust and part of the reservation of the Rancheria prior to October 17, 1988.

Pub. L. 106-568, Stat. 2868.

1  compact covering its land in San Pablo, the San Pablo Legislation

2  apparently exempts it from the consultation requirements in §

3  2719.

4  D.    Plaintiffs' Allegations

5      This complaint was filed on February 7, 2001.   The

6  plaintiffs in this case consist of four card clubs and two

7  charities that offer class II gaming in Northern California and

8  that are prohibited by the California Penal Code from offering

9  any form of class III gaming including banking card games and

10 slot machines.[20]  Plaintiffs attack the monopoly on class III

11 gaming accorded by the compacts and allege that various state and

12 federal officers violated IGRA and the Fifth and Fourteenth

13 Amendments by entering into, approving, and administering the

14 compacts.   The named federal defendants are Gale Norton,

15 Secretary of the Interior, and James McDivitt, Acting Assistant

16 Secretary of the Interior for Indian Affairs ("federal

17

18

19    [20]  Plaintiffs are Artichoke Joe's in San Bruno, California;
   California Grand Casino in Pacheco, California; Lucky Chances in
20 Colma, California; and Oaks Club Room in Emeryville, California.
   (Complaint at ¶¶ 15-18).   Customers at these establishments "play
21 various card games in which participants wager against each other
   and pay the operator a fee for the use of the facility."   Id.
22 Plaintiffs Fairfield Youth Foundation and Sacramento Consolidated
   Charities are non-profit corporations located in Fairfield and
23 Sacramento, respectively.   Id. at ¶ 19.   Both organizations
   operate bingo games to raise money for charitable organizations.
24 Id. at ¶ 20.   Each plaintiff submitted a declaration stating that
   it would like to offer class III gaming and that it has
25 facilities for doing so.   Sammut Decl. at ¶ 11 (Artichoke Joe's);
   Medina Decl. at ¶ 7 (Lucky Chances); Wilkinson Decl. at ¶¶ 3-4
26 (California Grand); Taylor Decl. at ¶ 4 (Fairfield Youth
   Foundation); Beers Decl. at ¶ 3 (Sacramento Consolidated
   Charities); and Tibbit Aff. at ¶¶ 4-5 (Oaks Club Room).

defendants"). The named state defendants are Gray Davis,
Governor of the State of California; Harlan W. Goodson, Director
of the California Division of Gambling Control; John E. Hensley,
Chair of the California Gambling Control Commission; Michael C.
Palmer, J.K. Sasaki, and Arlo Smith, members of the California
Gambling Control Commission; and Bill Lockyer, Attorney General
of the State of California ("state defendants"). Id. at ¶¶ 21-
26.

Plaintiffs argue that the state's prohibition on class III
gaming keeps them from competing for part of a significant
market--tribal gaming in California may generate up to $4.7
billion per year by 2004. (Eadington Decl. at ¶ 8). According
to plaintiffs, the class II gaming they are permitted to offer
cannot compete with the Las Vegas style gaming offered by the
tribes. (Id. at ¶ 19). Banking and percentage card games offer
gamblers the chance to win more money and are more profitable for
class III operators because the operator can take a stake in the
action. (Id. at ¶ 20). And because of their stake in the
activity, class III operators do not need to charge players by
the hand or the hour the way that class II operators do. Slot
machines also contribute to the popularity of class III gaming
casinos. In most casinos, slot machines account for "in excess
of 70% of total gaming winnings," and depending on location,
competition, and how they are regulated, each machine may
generate between $88 and $440 per day. (Id. at ¶¶ 10, 18). As
of January 25, 2001, there were over 25,000 slot machines in use

on Indian lands in California.  (<u>Id.</u> at ¶ 11).

Plaintiffs argue that "[m]any customers who presently patronize California cardrooms and charity bingo games are likely to be attracted by the greater variety of games, and the greater payoffs, offered at casinos conducting class III gaming, particularly those that offer slot machines," an effect documented in other states that have introduced tribal gaming. (Complaint at ¶ 29; Eadington Decl. at ¶¶ 25-29 (noting effect of class III Indian gaming in Arizona, Michigan, and New Orleans)). Plaintiffs are especially concerned that a tribe will be permitted to offer class III gaming in an urban area putting class III gaming casinos in closer proximity to the plaintiffs' establishments.  (Complaint at ¶ 8).

Plaintiffs' complaint contains four counts.  In count I, plaintiffs allege that the federal defendants' approval of the compacts violated the APA, because the compacts, and hence the approvals, violate IGRA, the Johnson Act, and the Fifth Amendment to the United States Constitution.  (Complaint at ¶ 75). Plaintiffs essentially make two arguments; they argue that extending a class III gaming monopoly to Indian tribes (1) violates IGRA's "any person, organization, or entity" requirement, 25 U.S.C. § 2710(d), and (2) constitutes illegal discrimination on the basis of race and violates the Equal Protection and Due Process Clauses of the Fifth and Fourteenth Amendments.

The remaining three counts are all directed against the

21

state defendants and are brought under 42 U.S.C. § 1983.   Count
II, brought against the Governor, the Director of the California
Division of Gambling Control ("Director"), and the Chair and
members of the California Gambling Control Commission
("Commission"), alleges that Proposition 1A and the compacts
violate IGRA, the Johnson Act, and the Equal Protection Clause of
the Fourteenth Amendment.   (Id. at ¶ 78).   In count III, which is
directed at the Governor alone, plaintiffs allege that the San
Pablo legislation violates IGRA and the Johnson Act, and is
unconstitutional under the Equal Protection Clause of the
Fourteenth Amendment.   (Id. at ¶ 82-83).

Count IV, brought against the Attorney General, the
Director, and the Commission, seeks to preclude enforcement of
Cal. Penal Code §§ 330, 330a, 330b which prohibit class III
gaming in California.   Plaintiffs allege that continued
enforcement of these laws, when tribal gaming is exempted,
constitutes illegal discrimination on the basis of race or ethnic
origin.

Plaintiffs seek declaratory and injunctive relief on all
counts.   Specifically, plaintiffs seek a judgment to set aside
the federal defendants' approval of the compacts and a
declaration that such approvals violate IGRA, the Johnson Act,
the APA, the Fifth Amendment, and aid and abet the state
defendants' violation of the Fourteenth Amendment.   (Id. at 31).
The plaintiffs also seek (1) with respect to the Governor,
Director, and Commission, a declaration that Proposition 1A and

the compacts violate IGRA, the Johnson Act, the Supremacy Clause, and the Fourteenth Amendment, an injunction to prevent their continued participation in the administration of the compacts, and an injunction to prevent the Governor from executing any additional compacts; (2) with respect to the Governor, a declaration that any compact with the Lytton Rancheria based on H.R. 5528 violates IGRA, the Johnson Act, the Supremacy Clause, and the Fourteenth Amendment, and an injunction to prevent the Governor from entering into such a compact; and (3) with respect to the Governor, the Attorney General, the Director, and the Commission, a declaration that Article IV, Sec. 19(e) of the California Constitution and Cal. Penal Code §§ 330, 330a, 330b violate the Equal Protection Clause, and an injunction to prohibit enforcement of the Penal Code's general prohibition on class III gaming.

Plaintiffs and defendants have filed cross-motions for summary judgment on all claims, and the state defendants have filed a motion to dismiss.  In addition to arguing that Proposition 1A and the compacts are consistent with IGRA, the Johnson Act, and the Fifth and Fourteenth Amendments, the state and federal defendants raise a number of jurisdictional objections.  The court has also received several amicus curiae briefs.[21]

---

[21]   Amicus curiae briefs have been filed on behalf of plaintiffs by (1) Blue Devils, Inc., Pinole Area Senior Foundation, Inc., First Baptist Church of El Sobrante, and Lidia Robinson; (2) California Cities for Self Reliance Joint Powers Authority; (3) National Coalition Against Gambling Expansion,

1   Before turning to the merits, it is necessary to address the

2   multitude of objections to jurisdiction raised by the state and

3   federal defendants and several amici curiae.  Steel Co. v.

4   Citizens for a Better Environment, 523 U.S. 83 (1998) (federal

5   courts must resolve jurisdictional issues before merits).  The

6   state defendants argue that: (1) the plaintiffs lack standing;

7   (2) the state defendants are not proper defendants under 42

8   U.S.C. § 1983 or under Ex parte Young, 209 U.S. 123 (1908); and

9   (3) the case cannot proceed if the state defendants are dismissed

10   because they are necessary and indispensable parties.  The

11   federal defendants challenge the court's jurisdiction under the

12   APA.  They contend that plaintiffs have no cause of action under

13   the APA and that the plaintiffs are not within the zone of

14   interests protected by IGRA.  Finally, the court considers the

15   arguments of amicus curiae, California Nations Indian Gaming

16   Association ("CNIGA"), that the case must be dismissed because

17   the absent Indian tribes are necessary and indispensable parties.

18   Although all of these jurisdictional objections raise issues that

19   potentially preclude the court from reaching the merits of the

20   plaintiffs' claims, and have significantly increased the length

21   and complexity of this opinion, all but a very few fail, and

22   those that succeed do not greatly affect the scope of the inquiry

23

24   Stand-Up for California, Committee on Moral Concerns; and (4)
     Wildcat Canyon Conservancy.  Briefs on behalf of defendants have
25   been filed by (1) Agua Caliente Band of Cahuilla Indians (2) Bi-
     Partisan Group of Officers and Members of the California
26   Legislature; (3) California Nations Indian Gaming Association;
     and (4) Hotel Employees and Restaurant Employees International
     Union.

24

1  on the merits.

2  III.  Standing

3  The requirements for demonstrating standing to sue are well-
4  established.  As an "irreducible minimum," <u>Valley Forge Christian</u>
5  <u>College v. Americans United for Separation of Church and State,</u>
6  <u>Inc.</u>, 454 U.S. 464, 472 (1982), parties who seek to establish
7  standing must show (1) a concrete and imminent "injury in fact",
8  (2) a causal connection between the defendants and the alleged
9  injury, and (3) a likelihood that the injury will be redressed by
10 a favorable decision.  <u>Lujan v. Defenders of Wildlife</u>, 504 U.S.
11 555, 560-61 (1992); <u>Bernhardt v. County of Los Angeles</u>, 279 F.3d
12 862, 868 (9th Cir. 2002).  Invoking these concepts, the state
13 defendants advance two arguments on standing.  First, they argue
14 that there is no injury in fact with respect to the Governor's
15 future decisionmaking concerning additional compacts; and second
16 they argue that there is no causation or redressability with
17 respect to any of the state defendants.

18 A.  <u>Injury in Fact and Equitable Relief as to Governor Davis on</u>
19 <u>Counts II and III</u>

20 Plaintiffs who seek prospective injunctive relief must
21 demonstrate both a sufficient likelihood of future injury,
22 <u>Hawkins v. Comparet-Cassani</u>, 251 F.3d 1230, 1236 (9th Cir. 2001),
23 and that there is "a 'likelihood of substantial and immediate
24 irreparable injury.'"  <u>City of Los Angeles v. Lyons</u>, 461 U.S. 95,
25 111 (1983) (quoting <u>O'Shea v. Littleton</u>, 414 U.S. 488, 502
26 (1974)); <u>see also</u> <u>Cole v. Oroville Union High Sch. Dist.</u>, 228

1  F.3d 1092, 1100 (9th Cir. 2000).  The former stems from the
2  Article III case or controversy requirement; the latter is a
3  function of the traditional limits on the power of federal courts
4  to grant equitable relief.  Hodgers-Durgin v. De La Vina, 199
5  F.3d 1037, 1042, 1044 (9th Cir. 1999)(en banc).  To determine the
6  likelihood of future harm courts are guided "not only by the
7  defendants' past conduct but also by the defendants' avowed
8  future intent."  LaDuke v. Nelson, 762 F.2d 1318, 1330 (9th Cir.
9  1985).  Further, when a plaintiff seeks to enjoin a state agency
10 and its officers, the plaintiff must "'contend with the well-
11 established rule that the Government has traditionally been
12 granted the widest latitude in the dispatch of its own internal
13 affairs.'"  Midgett v. Tri-County Metro. Transp. Dist. of Oregon,
14 254 F.3d 846, 850 (9th Cir. 2001) (quoting Rizzo v. Goode, 423
15 U.S. 362, 378-79 (1976)); see also Hodgers-Durgin, 199 F.3d at
16 1042 ("The Supreme Court has repeatedly cautioned that, absent a
17 threat of immediate and irreparable harm, the federal courts
18 should not enjoin a state to conduct its business in a particular
19 way.").

20    1.   Count II: Existing and Future Compacts

21    As to the Governor and future compacts, it is unnecessary to
22 determine whether the plaintiffs satisfy the Article III injury
23 in fact requirement, because even if they did, plaintiffs would
24 still not be entitled to injunctive relief to prevent the
25 approval of additional compacts by the Governor because they have
26 not demonstrated "a threat of immediate and irreparable harm."

Hodgers-Durgin, 199 F.3d at 1042.[22]

The plaintiffs argue that there is an immediate threat of future injury because the Governor has already approved sixty-two compacts, the legislature has enacted an expedited approval provision, Cal. Gov't Code § 12012.25(b), and the Governor would be subject to suit if he failed to negotiate in good faith with a tribe that requests a class III gaming compact. 25 U.S.C. § 2710(d)(7). However, while the plaintiffs contend that as many as twenty tribes have expressed an interest in entering into gaming compacts, only two tribes have actually sought to enter into negotiations with the Governor following the approval of the first sixty-two compacts. (Eadington Decl. at ¶ 5). Negotiation of these compacts has not begun and the terms of these hypothetical compacts are, as yet, unknown. Moreover, it is also unclear if the Governor will approve additional compacts, especially compacts for casinos located in urban areas which allegedly pose the greatest risk to the plaintiffs. In fact, the Governor has declined to enter into further negotiations at least

_____

[22] Addressing the propriety of equitable relief while assuming that there is Article III standing does not run afoul of the rule against exercising hypothetical jurisdiction announced in Steel Co., 523 U.S. 83, because "there is no unyielding jurisdictional hierarchy." Ruhrgas AG v. Marathon Oil Co., 526 U.S. 574, 578 (1999). The court is, therefore, not required to address jurisdictional issues according to a specific checklist and may address jurisdictional issues in any order. See Midgett, 254 F.3d at 850; Hodgers-Durgin, 199 F.3d at 1042 n.3. However, because of the similarities between the Article III inquiry and the standard for granting prospective injunctive relief, the plaintiffs are almost certainly unable to establish Article III standing to seek an injunction to prevent the Governor from entering into additional compacts.

until this lawsuit is resolved.  In response to inquiries by the two tribes about entering into class III gaming compacts, the Governor replied negatively stating that "commencing formal negotiations at this time, amidst the uncertainty attending the current status of th[is] litigation, would not . . . be prudent."[23]  (Chang Letter, May 2, 2001, Exh. K to Pls.' Reply). The substantive legal issues presented in this lawsuit, and the greater policy and empirical issues that lie behind this litigation, are of such magnitude and complexity that it cannot be assumed that a responsible state officer would automatically continue to enter into further, identical compacts no matter the accumulation of experience, the pressures against permitting urban tribal gaming establishments, public opinion, and other potentially relevant economic and legal developments.  The many unknowns about additional class III gaming compacts preclude a finding that there is a danger of an immediate and irreparable harm from future compacts when no such compacts are even in the negotiation stage.

When a plaintiff both satisfies Article III and demonstrates an immediate and irreparable injury, courts will appropriately grant prospective injunctive relief against state officials. Lyons, 461 U.S. at 111-12.  But where, as here, there is an inadequate showing of immediate future irreparable injury, the need to "maintain[] the delicate balance between 'federal

---

[23]  One of the letters was sent to nine tribes.  (Chang Letter, May 2, 2001, Exh. K to Pls.' Reply).  It is unclear, however, if all of the tribes requested negotiations.

equitable power and State administration of its own law,'"
Hodgers-Durgin, 199 F.3d at 1042, compels deference to state
officials who are in the consideration phase of their
decisionmaking and have not committed to a future course of
action.  Lyons, 461 U.S. at 111-12.  Such restraint is especially
important when the requested injunction is a broad one that would
apply to "whole categories of potential future acts," in this
case, any class III gaming compact.  Hillbloom v. United States,
896 F.2d 426, 431 (9th Cir. 1990) (upholding district court's
refusal to "declare the inapplicability to the Northern Mariana
Islands of any law 'which substantially affects the lives of the
inhabitants'").  Moreover, it is also relevant that the
plaintiffs may seek declaratory relief as to the existing
compacts, a less intrusive remedy than an injunction, and one
that can resolve the most pressing issues related to Indian
gaming under IGRA in a setting best suited to resolution in the
federal courts because the terms of the compacts are not
hypothetical.  See Steffel v. Thompson, 415 U.S. 452, 465-68
(1974) (describing declaratory relief as less intrusive remedy as
compared to injunction); Morrow v. Harwell, 768 F.2d 619, 627
(5th Cir. 1985) ("There is no question but that the passive
remedy of a declaratory judgment is far less intrusive into state
functions than injunctive relief that affirmatively commands
specific future behavior under the threat of the court's contempt
powers.").  Having failed to demonstrate an immediate and
irreparable harm, plaintiffs may not seek in count II prospective

injunctive relief against the Governor to prohibit him from entering into additional compacts.

In addition, the plaintiffs' "failure to establish a likelihood of future injury similarly renders their claim for declaratory relief unripe" as to future, hypothetical compacts. Hodgers-Durgin, 199 F.3d at 1044. As the Ninth Circuit recently explained, "[i]n suits seeking both declaratory and injunctive relief against a defendant's continuing practices, the ripeness requirement serves the same function in limiting declaratory relief as the imminent-harm requirement serves in limiting injunctive relief." (Id.) Thus, for the same reason that there is no imminent future injury that justifies prospective injunctive relief, the plaintiffs' claim for declaratory relief with respect to future compacts fails because it is unripe. Texas v. United States, 523 U.S. 296, 300 (1998)("A claim is not ripe for adjudication if it rests upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'").

With respect to the existing compacts and the Governor, the plaintiffs have properly alleged an injury in fact which could merit declaratory relief under the Declaratory Judgment Act, 22 U.S.C. §§ 2201 et seq. Plaintiffs allege both a violation of their right to equal protection of the laws and economic injury. Together these allegations form an adequate basis for standing to

seek declaratory relief.[24]

In sum, as to count II, which in part seeks prospective injunctive and declaratory relief against the Governor, the court finds that plaintiffs have failed to demonstrate that they face an immediate and imminent threat of harm from future compacts. For this reason, plaintiffs are only entitled to seek declaratory relief as to existing compacts under count II.

### 2.   Count III: Lytton Rancheria

A similar analysis applies to count III of the complaint which seeks declaratory and injunctive relief against the Governor with respect to the Lytton Rancheria.  Because the Lytton Rancheria is no closer to entering into a gaming compact than any other tribe without a compact, plaintiffs' injuries with respect to count III are no more imminent than they are with respect to count II.  Although the Municipal Services Agreement between the Lytton Rancheria and San Pablo states that the Lytton Rancheria will seek to enter into negotiations for a class III gaming compact, it has not yet done so.  (St. Defs.' SUF at ¶ 24).  Moreover, because it would permit gaming in an urban area, an eventuality that the plaintiffs contend would be novel and particularly damaging to existing gaming operations, the Governor might be even more reluctant to negotiate a compact with the Lytton Rancheria.  For these reasons, equitable relief is

_____

[24]   Because the plaintiffs have viable claims under federal law, Skelly Oil v. Phillips Petroleum, 339 U.S. 667 (1950), does not preclude plaintiffs from seeking a declaratory judgment. (St. Defs.' Motion at 64).

1  improper because there is no threat of immediate and irreparable

2  harm that would warrant an injunction, and the plaintiffs'

3  request for declaratory relief is, therefore, unripe.

4      Further, plaintiffs may not establish jurisdiction on the

5  basis that they have been deprived of a procedural right to

6  petition the Governor and the Secretary concerning the potential

7  adverse affects of a proposed casino.  (Pls.' Reply at 39-41).

8  Assuming that § 2719 may afford plaintiffs a procedural right of

9  consultation that was foreclosed by the San Pablo legislation,[25]

10  any such procedural right is not implicated until a tribe

11  requests negotiations for a class III gaming compact on land that

12  was acquired after October 17, 1988.  Therefore, Congress'

13  decision to "backdate" the acquisition of the San Pablo land is

14  of no consequence unless and until the Lytton Rancheria seeks to

15  enter into a class III gaming compact.  Because any attempt to

16  exercise rights based on § 2719 at this point in time would be

17  premature, plaintiffs' argument that the San Pablo legislation

18  deprived them of procedural rights under § 2719 is also not

19  suited for review.

20  B.  Causation

21      To demonstrate causation, the plaintiffs' alleged injuries -

22

23      [25]  The Ninth Circuit applies a different rule to procedural

24  standing claims and requires plaintiffs to show: "(1) that it has
   been accorded a procedural right to protect its interests, and

25  (2) that it has a threatened concrete interest that is the
   ultimate basis of its standing."  Churchill County v. Babbitt,

26  150 F.3d 1072, 1078 (9th Cir. 1998).  The court does not reach
   the question of the full extent of the plaintiffs' procedural
   rights, if any, under 25 U.S.C. § 2719.

1  - competitive economic harm and violation of equal protection --

2  must be "fairly traceable" to the defendant's conduct, <u>Pritkin v.</u>

3  <u>Dep't of Energy</u>, 254 F.3d 791, 796 (9th Cir. 2001), and the

4  injuries must not be "'the result of the independent action of

5  some third party not before the court.'"   <u>Lujan v. Defenders of</u>

6  <u>Wildlife</u>, 504 U.S. 555, 560 (1992)(quoting <u>Simon v. Eastern Ky.</u>

7  <u>Welfare Rights Org.</u>, 426 U.S. 26, 41-42 (1976)).   Further,

8      [w]hen . . . a plaintiff's asserted injury
       arises   from   the   government's   allegedly
9      unlawful regulation (or lack of regulation) of
       *someone else*, much more is needed [than when
10     the   plaintiff   is   the   subject   of   the
       government's   regulation].       In   that
11     circumstance,   causation   and   redressability
       ordinarily   hinge   on   the   response   of   the
12     regulated (or regulable) third party to the
       government action or inaction--and perhaps on
13     the response of others as well.

14  <u>Lujan</u>, 504 U.S. at 562 (emphasis in original); <u>see also</u> <u>G & G</u>

15  <u>Fire Sprinklers, Inc. v. Bradshaw</u>, 156 F.3d 893, 899-900 (9th

16  Cir. 1997) (same).   Thus, in order to demonstrate causation,

17  plaintiffs must show that the alleged harms flow directly from

18  the state defendants' actions.

19      1.   <u>Count II: Governor, Commission, and Director</u>

20      With respect to count II of the complaint, plaintiffs' claim

21  against the Governor satisfies the causation requirement because

22  the Governor approved the compacts that gave rise to the

23  plaintiffs' injuries.   (Complaint at ¶¶ 23, 79).   It is not

24  material to the causation analysis that Governor Davis does not

25  have ongoing responsibilities under the compacts, once approved.

26  It is enough that his past approval of the compacts caused the

plaintiffs' alleged injuries.

Plaintiffs have failed, however, to adequately respond to the state defendants' argument that neither the Director nor the Commission have duties that caused class III tribal gaming.  (St. Defs.' Motion for Summary Judgment at 12).  Without addressing the issue of causation, plaintiffs' argue only that there is redressability because an injunction preventing the Director and the Commission from renewing their determinations of suitability for persons working in or with the casinos would hamper the casinos' ability to operate.  Because causation and redressability are frequently duplicative of one another, plaintiffs presumably hope that in establishing redressability, they will also establish causation.

Causation and redressability, however, are not always two sides of the same coin.  "Despite . . . similarities, . . . each inquiry has its own emphasis.  Causation remains inherently historical; redressability quintessentially predictive."  Freedom Republicans, Inc. v. Federal Election Comm'n, 13 F.3d 412, 418 (D.C. Cir. 1994); see also Allen v. Wright, 468 U.S. 737, 753 n.19 (1984) (noting differences between causation and redressability).  Here, even if the plaintiffs established redressability, their predictions about the impact of an injunction on the Director and the Commission would not establish an historical connection between the actions of the Director and the Commission, and the plaintiffs' injuries.

As to redressability, plaintiffs rely principally on §§

34

6.4.4(b), 6.4.5, 6.4.6, of the compacts which, subject to certain exceptions, prohibit persons from working in or with casinos, or from financing them, if they had an application for a determination of suitability denied by the State Gaming Agency. (Pls.' Reply at 68; Pls.' Reply to St. Defs.' SUF at ¶ 23). These provisions might suggest that the State Gaming Agency is responsible for licensing most persons who work in or with Indian casinos. If true, this might satisfy the causation requirement because without the Director and the Commission fulfilling their licensing duties, tribal gaming might not have been possible.

Yet, a closer reading of the compacts reveals that the licensing responsibilities of the State Gaming Agency are relatively minor. Rather, the Tribal Gaming Agency has primary responsibility for issuing licenses to virtually every person who works in or with Indian casinos.[26] (Compact § 6.4.1). Sections 6.4.4(b), 6.4.5, and 6.4.6, of the compacts merely prohibit the Tribal Gaming Agency from licensing persons who have had determinations of suitability denied by the State Gaming Agency, but they do not require persons working in or with tribal casinos

_____

[26] Section 6.4.1 of the compacts states:
> All persons in any way connected with the Gaming Operation or Facility who are required to be licensed or to submit to a background investigation under IGRA, and any others required to be licensed under this Gaming Compact, including, but not limited to, all Gaming Employees and Gaming Resource Suppliers, and any other person having a significant influence over the Gaming Operation must be licensed by the Tribal Gaming Agency.

1   to apply for licenses from the State Gaming Agency.[27]   Thus, even
2   if the licensing of such persons satisfied the causation
3   requirement, the compacts themselves demonstrate that it is the
4   actions the Tribal Gaming Agency, and not the State Gaming
5   Agency, that are fairly traceable to the plaintiffs' injuries.

6       Finally, even if they had established causation, plaintiffs
7   have not demonstrated redressability.   An injunction to prevent
8   the State Gaming Agency from issuing or renewing determinations
9   of suitability would do little to hamper the casinos' ability to
10  operate because virtually all persons receive both their initial
11  licenses and license renewals from the Tribal Gaming Agency.

12      2.   Count IV: Attorney General, Director, Commission and
13           Penal Code Enforcement

14      The state defendants offer two arguments as to why there is
15  no causation with respect to count IV of the complaint which
16  seeks to enjoin the Attorney General, the Director, and the
17  Commission from enforcing Penal Code §§ 330, 330a, 330b, the
18  state criminal law provisions that prevent the plaintiffs from
19  offering class III gaming.   First, the state defendants argue
20  that there is no causal connection between the Attorney General

21

22      [27]   The compacts state that except for "non-key Gaming
23  Employees," the Tribal Gaming Agency must require all license
    applicants to file an application with the State Gaming Agency
24  for a determination of suitability for licensure under the
    California Gambling Control Act.   Id. at § 6.5.6.   The compacts,
25  however, do not distinguish "non-key Gaming Employees" from "key
    Gaming Employees," and the plaintiffs have failed to provide any
26  evidence to support a causal connection between the State Gaming
    Agency's act of licensing these persons, "key Gaming Employees,"
    and the plaintiffs' injuries.

1   and the alleged harm, class III gaming by Indian Tribes.  (St.

2   Defs.' Motion for Summary Judgment at 12-13).  This argument,

3   however, incorrectly treats the alleged harm under count IV as

4   class III gaming by Tribes in violation of IGRA and the Equal

5   Protection Clause, when the actual harm alleged here is the

6   inequitable application of the Penal Code provisions to the

7   plaintiffs thereby preventing them from offering class III

8   gaming.  (Complaint at 32-33).  If the plaintiffs' allegations

9   are correct, then they are entitled to seek this relief because

10  the equal protection violation may be remedied either by

11  prohibiting class III gaming as to every one, or by permitting it

12  as to every one.[28]

13      The state defendants next argue that there is no causation

14  because none of the individuals named in count IV, the Attorney

15  General, the Director, and the Commission, has authority to

16  prevent all enforcement of the Penal Code provisions, for

17  example, by a District Attorney.  (St. Defs.' Motion for Summary

18  Judgment at 13).  This argument confuses causation analysis with

19  redressability.[29]  The question is not whether these defendants

20

21      [28]  The state defendants argue that the court should abstain
    from granting the plaintiffs' requested relief under Younger v.
22  Harris, 401 U.S. 37 (1971).  (St. Defs.' Motion for Summary
    Judgment at 56).  However, because Younger abstention is not
23  jurisdictional, and because the plaintiffs are not entitled to
    injunctive relief under count IV, it is unnecessary to address
24  the applicability of Younger.  See Benavidez v. Eu, 34 F.3d 825,
    829 (9th Cir. 1994) (citing New Orleans Pub. Serv., Inc. v.
25  Council of New Orleans, 491 U.S. 350, 358-59 (1989)).

26      [29]  Redressability is not a problem as to count IV.  First,
    it is likely that the District Attorneys will follow the court's
    ruling, especially given their tendency to look to the Attorney

can prevent enforcement of the Penal Code provisions.  Rather,
the causation question is whether the alleged injury -- the
threatened or actual enforcement of the Penal Code provisions
against the plaintiffs such that they are unable to offer the
same class III gaming offered by the tribes -- is fairly
traceable to the state defendants.  The history of letters
written by the Attorney General and the Director to the
plaintiffs and other California card clubs, as well as their
interaction with local law enforcement officials adequately
satisfies the causation requirement.  "Here, there has clearly
been a specific threat of prosecution . . . [and] such an express
threat instills a fear of criminal prosecution that cannot be
said to be 'imaginary or wholly speculative.'"  Culinary Workers
Union, Local 226 v. Del Papa, 200 F.3d 614, 617 (9th Cir. 1999).

Specifically, in 1988, then Attorney General Van De Kamp and
the Manager of the Gaming Registration Program wrote to Artichoke
Joe's stating that if Artichoke Joe's offered a game called
"Texas hold-em," it would be in violation of Cal. Penal Code §
330 and "administrative action will be taken against [its]
registration."  (Van de Kamp, Watson Letter, Exh. O to Pls.'
Motion).  The letter was also sent to local law enforcement
officials.  (Id.)  Similarly, in 1989, Attorney General Van de
Kamp and the Director of the Division of Law Enforcement sent a

General for policy on gaming.  Second, for purposes of Article
III, it is sufficient that redressability is likely; plaintiffs
need not establish it with absolute certainty.  See infra pp. 42-
45.

38

1  notice to all "California Card Club Owners," a category that
2  includes several of the plaintiffs, stating that if they offered
3  "percentage games," they would be in "violation of the Penal Code
4  and the Gaming Registration Act which may result in
5  administrative action on the part of the State Gaming
6  Registration Program as well as possible criminal prosecution."
7  (Van de Kamp, Clemens Letter, Exh. P to Pls.' Motion).  Another
8  letter that year addressed to "California Card Club Owners" again
9  warned of administrative action and "possible criminal
10  prosecution" if they offered "jackpot poker."  (Van de Kamp,
11  Clemens Letter, Exh Q to Pls.' Motion).  In 1997, Attorney
12  General Lungren and the Manager of the Office of Gaming
13  Registration notified all card club owners that percentage card
14  games are illegal.  (Van de Kamp, Letter Exh. R to Pls.' Motion).
15  The letter was also sent to "All Affected Law Enforcement
16  Agencies," and it stated that the Attorney General was requesting
17  that "they monitor compliance to ensure that all gaming clubs are
18  charging the proper fees of their patrons."  (Id.)

19  Moreover, Attorney General Lockyer and the current Director
20  of the Division of Gambling Control, Harlan Goodson, have
21  published several law enforcement advisories on issues related to
22  gambling.  One advisory, sent to "All Police Chiefs and
23  Sheriffs," described "Tab Force," an illegal bingo operation.
24  (Tab Force Advisory, Exh. S to Pls.' Motion).  The letter noted
25  that although the Division of Gambling Control lacked
26  jurisdiction over bingo operations, it could investigate

1  suspected violations of state gambling laws and provide advice to
2  local law enforcement agencies for use in the regulation of
3  bingo.  (Id.)   The letter specifically advised law enforcement
4  agencies that "Tab Force constitutes an unlawful gambling device
5  within the meaning of sections 330b and 330.1 of the Penal Code."
6  (Id.)   In other advisories, the Attorney General and the Director
7  discussed what constitutes a "Gaming Activity," the need for card
8  clubs to report to the Division of Gambling Control the forms of
9  gambling offered by the clubs, and the legality of "Jackpot
10  Poker."  (Exh. N to Pls.' Motion).  On at least one occasion in
11  1998, the San Bruno District Attorney wrote to the Director to
12  inquire about the legality of a specific gaming practice and
13  whether it constituted an illegal percentage game.  (Exh. T to
14  Pls.' Motion).  The District Attorney's letter specifically
15  stated that Artichoke Joe's had requested an opinion on the game
16  and that the District Attorney was seeking the opinion of the
17  Division of Gaming Control because "[w]e need to have a uniform
18  policy in the state in order that card clubs can have a level
19  playing field upon which to conduct their games."  (Id.)

20      As in Culinary Workers Union, Local 226, where the Ninth
21  Circuit found a case or controversy because the Attorney General
22  had written a letter specifically threatening to cause the
23  statute to be enforced, the Attorney General and the Director
24  have an unambiguous record of warning clubs of potential criminal
25  prosecution and administrative action if they violate Penal Code
26  provisions prohibiting class III gaming.  They also have taken

40

the lead in setting statewide policy with respect to gambling.
Thus, the threat of criminal prosecution under the Penal Code
provisions by these defendants, as well as administrative action,
is not "'imaginary, speculative or chimerical.'" Snoeck v.
Brussa, 153 F.3d 984, 987 (9th Cir. 1998) (quoting Shell Oil Co.
v. Noel, 608 F.2d 208, 213 (1st Cir. 1979)).  For these reasons,
the plaintiffs have satisfied the Article III causation
requirement as to the Attorney General and the Director.

The plaintiffs have failed, however, to provide evidence
demonstrating that the threat of enforcement of the Penal Code
provisions is fairly traceable to the Commission.  None of the
documents provided by the plaintiffs bears the names of any of
the members of the Commission.  Thus, although the Commission may
well be empowered to revoke plaintiffs' gaming licenses if they
violate the Penal Code provisions, the plaintiffs have done
nothing more than restate their original allegations to this
effect.  This is insufficient to survive a motion for summary
judgment.  Los Angeles County Bar Ass'n v. Eu, 979 F.2d 697, 700
(9th Cir. 1992) ("At the summary judgment stage, the plaintiff
must set forth specific facts, rather than mere allegations, that
if true would suffice to establish standing.").

In summary, as to causation, the court finds that with
respect to count II, plaintiffs have satisfied the causation
requirement as to the Governor, but not the Director or the
Commission.  With respect to count IV, plaintiffs have satisfied
the causation element as to the Governor and the Director, but

1  not the Commission.[30]

2  C.   Redressability: Governor and Count II

3  To establish redressability, plaintiffs must show that it is

4  "likely, as opposed to merely speculative that the injury will be

5  redressed by a favorable decision."   Bernhardt v. County of Los

6  Angeles, 279 F.3d 862, 869 (9th Cir. 2002).   A "claim may be too

7  speculative if it can be redressed only through 'the unfettered

8  choices made by independent actors not before the court.'"   Id.

9  (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560

10  (1992)).   However, a plaintiff can still satisfy the

11  redressability requirement in such a case by meeting "the burden

12  . . . to adduce facts showing that those choices have been or

13  will be made in such manner as to . . . permit redressability of

14  injury."   Lujan, 504 U.S. at 562.   Thus, in Franklin v.

15  Massachusetts, 505 U.S. 788 (1992), decided less than two weeks

16  after Lujan, the Court held that the plaintiffs satisfied

17  redressability in a suit brought against the Secretary of

18  Commerce to require her to reallocate the apportionment of

19  overseas military personnel in the 1990 census, even though the

20  President would make a final determination on the census.   A

21  plurality of the Court held that declaratory relief against the

22  Secretary would redress the plaintiffs' injuries because "she has

23  an interest in litigating [the census's] accuracy . . . [and] it

24

25  [30]   For similar reasons, the claim against the Director and
the Commission does not meet the causation requirement of Ex
26  parte Young, 209 U.S. 123 (1908) as to count II, and the claim
against the Commission does not meet this requirement as to count
IV.

1   is substantially likely that the President and other executive
2   and congressional officials would abide by an authoritative
3   interpretation of the census statute and constitutional provision
4   by the District Court, even though they would not be directly
5   bound by such a determination."  Id. at 803.  Therefore, although
6   redressability depended at least in part on the actions of third
7   parties, the Court was satisfied that the third parties would
8   follow and enforce the law thus making redressability likely.[31]

9       As to count II and the IGRA and equal protection claims on
10  the existing compacts, the state defendants contend that
11  redressability is too speculative to support standing because the
12  tribes are not parties to the suit and a decision in the
13  plaintiffs' favor would, therefore, not be binding on them.  (St.
14  Defs.' Motion for Summary Judgment at 13).  Moreover, they argue
15  that if the court invalidates the compacts and Proposition 1A,
16  the State would lose its power to stop any continued class III
17  gaming because, in the absence of a valid IGRA-sanctioned
18  compact, 18 U.S.C. § 1166 gives the federal government exclusive
19  enforcement authority over Indian gaming.  (Id. at 13-14).  See

20

21      [31]  See also Made in the USA Foundation v. United States,
22  242 F.3d 1300, 1306-11 (11th Cir. 2001) (finding redressability
    in suit challenging constitutionality of the North American Free
23  Trade Agreement and that even though President could not be
    ordered to terminate participation in NAFTA, judicial order would
24  be followed by subordinates); Los Angeles County Bar Ass'n, 979
    F.2d at 701 (redressability requirement was satisfied in suit
25  against Governor and Secretary of State claiming injury due to
    lack of judges in Los Angeles County because it was substantially
26  likely that the California legislature, although its members were
    not parties to the action, would abide by the court's
    declaration) (citing Franklin, 505 U.S. at 803).

43

United States v. E.C. Investments, Inc., 77 F.3d 327, 330 (9th Cir. 1996) ("Section 1166(d) grants the United States 'exclusive jurisdiction over criminal prosecutions of violations of State gambling laws that are made applicable under this section to Indian country.'").  Thus, the state defendants contend that if the plaintiffs prevail on the merits, the state defendants will be powerless to stop any illegal Indian gaming.

The state defendants' arguments are misplaced for several reasons.  First, the plaintiffs do not need to prove a negative, namely that the tribes would not engage in illegal gaming in order to demonstrate redressability.  If plaintiffs had to "negate . . . speculative and hypothetical possibilities . . . in order to demonstrate the likely effectiveness of judicial relief," they would rarely ever be able to establish standing. Duke Power Co. v. Carolina Envtl. Study Group, 438 U.S. 59, 78 (1978).

Second, even if the tribes were inclined to violate IGRA and state penal code prohibitions, there is no reason to assume that the federal government would shirk its enforcement responsibilities under 18 U.S.C. § 1166 by countenancing illegal class III gaming by Indian tribes.  Thus, although redressability may depend, at least in part, on the actions of third parties, this case more closely resembles Franklin than it does Lujan. Indeed, unlike in Lujan where it was unclear whether outside agencies would be bound by the Secretary of the Interior's interpretation to require consultation for international

44

1  projects, a ruling that invalidates the compacts and Proposition
2  1A would conclusively establish the illegality of any continued
3  class III gaming by Indian tribes.  Lujan, 504 U.S. at 555.  The
4  sole contingency, therefore, would be whether the federal
5  authorities responsible for prosecuting illegal gaming would do
6  so, and, as in Franklin, Made in the USA, and Eu, the court is
7  entitled to expect that they will follow the law.

8      Because "[p]laintiffs need not demonstrate that there is a
9  'guarantee' that their injuries will be redressed by a favorable
10 decision," it is likely, and not merely speculative, that a
11 declaratory judgment invalidating the existing compacts and
12 Proposition 1A would redress the plaintiffs' injuries.  Graham v.
13 Fed. Emergency Mgmt. Agency, 149 F.3d 997, 1003 (9th Cir. 1998);
14 see also Competitive Enter. Inst. v. National Highway Traffic
15 Safety Admin., 901 F.2d 107, 117-18 (D.C. Cir. 1990)
16 ("Petitioners need not prove that granting the requested relief
17 is certain to redress their injury, especially where some
18 uncertainty is inevitable.").

19     Therefore, the court concludes that the plaintiffs have
20 demonstrated that a favorable ruling would likely redress their
21 alleged injuries.

22                    IV.   Ex Parte Young[32]

23

24     [32]  The analysis in this section also applies to the state
   defendants' arguments, (St. Defs.' Motion for Summary Judgment at
25 42-44), that they are not liable under 42 U.S.C. § 1983 because
   they were not personally involved in the alleged violations of
26 federal law.  See Jones v. Williams, 286 F.3d 1159, 1163 (9th
   Cir. 2002) (noting that there is no respondeat superior liability
   under § 1983 and that claim must be predicated on defendant's

                                45

1    The Ex parte Young exception to the Eleventh Amendment

2 permits suits for prospective declaratory or injunctive relief if

3 suit is brought against a state official acting in an official

4 capacity. Ex parte Young, 209 U.S. 123 (1908). The "obvious

5 fiction" of Ex parte Young, however, only stretches so far and is

6 subject to several constraints. Idaho v. Coeur d'Alene Tribe,

7 521 U.S. 261, 270 (1997).[33]  For example, Young may not be

8 invoked to provide declaratory relief against a state official

9 for a wholly past violation of federal law, Green v. Mansour, 474

10 U.S. 64 (1985), unless accompanied by an ongoing violation of

11 federal law. Papasan v. Allain, 478 U.S. 265, 282 (1986).

---

13 personal action). Because the personal involvement requirement
14 for § 1983 and the causal connection requirement for Young are so
    similar, and largely serve the same purposes, the court's
    determination that the state defendants may be sued under Young
15 also establishes that they are proper defendants under § 1983.

16     [33]  The constraints on Ex parte Young imposed by Seminole
    Tribe of Florida v. Florida, 517 U.S. 44 (1996), and Idaho v.
17 Coeur d'Alene Tribe, 521 U.S. 261 (1997), do not apply in this
    case.  First, Congress did not create a detailed remedial scheme
18 to enforce section 2710(d)(1), which permits class III gaming on
    certain conditions, unlike the provisions of IGRA which the Court
19 held could not be enforced by an Ex parte Young action in
    Seminole Tribe, 517 U.S. at 74.  Second, Coeur d'Alene does not
20 apply because a decision favorable to the plaintiffs would not
    implicate California's special sovereignty interests.  See Agua
21 Caliente Band of Cahuilla Indians v. Hardin, 223 F.3d 1041, 1048
    (9th Cir. 2000) ("We start with the principle that the Young
22 doctrine is alive and well and that Coeur d'Alene addressed a
    unique, narrow exception not present here.  We do not read Coeur
23 d'Alene to bar all claims that affect state powers, or even
    important state sovereignty interests.").  Finally, because the
24 Ninth Circuit has held that "[t]he viability of Ex parte Young as
    traditionally applied survives the Supreme Court's treatment of
25 the issue in Idaho v. Coeur d'Alene Tribe," there is no need to
    consider whether plaintiffs may bring an action under Young when
26 a state forum is available to litigate their federal claims.  Id.
    at 1050 (quoting Doe v. Lawrence Livermore Nat'l Lab., 131 F.3d
    836, 839 (1997)).

1   Another important limit on Young is the causation requirement.
2   As the Court explained in Young, not every state officer is
3   subject to suit simply by virtue of being a state officer.
4   Rather, the "officer must have some connection with the
5   enforcement of the act, or else it is merely making him a party
6   as a representative of the State, and thereby attempting to make
7   the State a party."  Ex parte Young, 209 U.S. at 157.  Further,
8   the "connection must be fairly direct; a generalized duty to
9   enforce state law or general supervisory power over the persons
10  responsible for enforcing the challenged provision will not
11  subject an official to suit."  Los Angeles County Bar Ass'n v.
12  Eu, 979 F.2d 697, 704 (9th Cir. 1992).  However, a plaintiff's
13  failure to link a state officer's actions to a specific
14  enforcement proceeding will not preclude a Young suit if the
15  conduct does not generally give rise to enforcement proceedings,
16  and the state officer is shown to have a direct connection to the
17  alleged harm.  Compare Snoeck v. Brussa, 153 F.3d 984, 987 (9th
18  Cir. 1998) (Nevada Commission on Judicial Discipline was not a
19  proper defendant under Young because it lacked a direct
20  connection to enforcement proceedings where challenged conduct
21  included potential contempt of court that could only be imposed
22  by Nevada Supreme Court), with Los Angeles County Bar Ass'n, 979
23  F.2d at 704 (Governor and Secretary of State were proper
24  defendants under Young, notwithstanding absence of their direct
25  connection to enforcement proceedings, because the challenged
26  conduct did not give rise to such proceedings and they had a

47

1 direct connection to the alleged harm).

2 A.   Count II: Existing Compacts as to Governor, Director, and
     Commission
3

4    The Governor is a proper party subject to suit under the
5 Young doctrine because the plaintiffs' claims are "not based on
6 any general duty to enforce state law." Id. Rather, the
7 Governor is alleged to have "a specific connection to the
8 challenged statute." Id. Indeed, for the same reasons that the
9 Governor is claimed to have caused the plaintiffs' alleged
10 injuries for purposes of Article III standing, he is also a
11 proper defendant under Young: The Governor negotiated and
12 approved the compacts that give rise to the plaintiffs' alleged
13 injuries. Culinary Workers Union, Local 226, 200 F.3d at 619
14 (applying Article III causation analysis to Young); Deida v. City
15 of Milwaukee, 192 F.Supp.2d 899, 916-17 (E.D. Wis. 2002) (causal
16 connection requirement under Young "closely overlap[s] with the
17 causation and redressability inquiries for standing"). If the
18 plaintiffs' allegations are correct, the Governor violated
19 federal law -- IGRA and the Equal Protection Clause -- his
20 actions are ultra vires, and he is subject to suit under Young.

21    Moreover, although the Governor's conduct that gave rise to
22 the claimed violations of federal law has already occurred,
23 declaratory relief remains an appropriate remedy under Young
24 because the plaintiffs allege ongoing violations of federal law
25 due to the Governor's approval of the compacts. In Papasan, the
26 Court addressed the viability of Young in actions for declaratory

48

1 relief based on past conduct that gives rise to an ongoing
2 violation.  The plaintiffs challenged Mississippi's system of
3 funding public schools in areas that had received federal school
4 land grants.  The lands had long since been sold by the State,
5 and a substitute appropriation made, but the schools in areas
6 where the land had been sold received less money for their
7 schools from the appropriation than they would have if the lands
8 had been retained.  The plaintiffs alleged that Mississippi's
9 past actions in selling the lands caused the present disparity in
10 school funding that violated the state's trust responsibilities
11 and the Equal Protection Clause.  While finding that the alleged
12 trust violation was the kind of wholly past violation and request
13 for restitution that would not survive the Eleventh Amendment,
14 the Court agreed that the Equal Protection claims fell within
15 Young: "This alleged ongoing constitutional violation--the
16 unequal distribution by the State of the benefits of the State's
17 school lands--is precisely the type of continuing violation for
18 which a remedy may permissibly be fashioned under Young."
19 Papasan, 478 U.S. at 282.

20     As in Papasan, the plaintiffs also allege ongoing violations
21 of federal law.  They argue that the compacts now in effect
22 violate IGRA and the Equal Protection Clause and place them at a
23 disadvantage.  The plaintiffs' alleged injuries from their
24 inability to compete continue until the compacts come to an end,
25 which might not be until 2020.  (Compact at § 11.2.1).  Thus, as
26 in Papasan, Young applies because the Governor's past approval of

1  the compacts also causes ongoing claimed violations of federal
2  law that presently harm the plaintiffs. Papasan, 478 U.S. at 282
3  ("the essence of the equal protection allegation is the present
4  disparity in the distribution of the benefits of state-held
5  assets and not the past actions of the State").

6  B.   Count IV: Penal Code Enforcement and Attorney General,
7       Director, and Commission

8  Plaintiffs may also rely on the Young doctrine to pursue
9  their claims against the Attorney General and the Director of the
10 Division of Gambling Control to enjoin enforcement of the Penal
11 Code provisions. For the same reasons that the claim against the
12 Attorney General and the Director satisfies the Article III
13 causation requirement, the claim also meets the causal connection
14 requirement under Young: The Attorney General and the Director
15 have repeatedly warned plaintiffs not to violate the relevant
16 Penal Code provisions barring Las Vegas style gambling. Thus,
17 unlike in Long v. Van de Kamp, 961 F.2d 151 (9th Cir. 1992) and
18 Southern Pacific Transp. Co. v. Brown, 651 F.2d 613 (9th Cir.
19 1980), the Attorney General and the Director are not being sued
20 solely because they have general supervisory responsibilities to
21 enforce state law. To the contrary, as in Culinary Workers
22 Union, Local 226, they have made specific warnings of criminal
23 prosecution and administrative action. Therefore, the Attorney
24 General and the Director have a sufficient causal connection to
25 the enforcement of the statute for purposes of Young.[34]

26 [34] Similarly, the Commission lacks a causal connection to
the plaintiffs' injuries for the same reason that its actions are

50

1    Thus, the court concludes that as to count II, plaintiffs

2  may bring an action under Ex parte Young against the Governor.

3  As to count IV, plaintiffs may bring an Ex parte Young suit

4  against the Attorney General and the Director.

5              V.   Administrative Procedure Act[35]

6    The federal defendants pose the next series of

7  jurisdictional questions by challenging plaintiffs' standing and

8  the availability of judicial review under the APA.   The APA

9  creates a cause of action for persons "adversely affected or

10 aggrieved by agency action within the meaning of a relevant

11 statute," 5 U.S.C. § 702, except to the extent the relevant

12 statute "preclude[s] judicial review" or the agency action "is

13 committed to agency discretion."   5 U.S.C. §§ 701(a)(1), (2).

14 The federal defendants argue that in the case of IGRA and the

15 Johnson Act, both §§ 701(a)(1) and (2) apply to preclude judicial

16 review of the plaintiffs' claims under the APA.   The federal

17 defendants also contend that the plaintiffs lack standing to sue

18 under § 702 of the APA because they are not within the zone of

19 interests sought to be protected by IGRA and the Johnson Act.

20 A.   Section 701(a)(1)

21   The APA creates a "right of action" to challenge final

22 agency action that is presumptively available even without "[a]

23

24

25 not "fairly traceable" for purposes of Article III standing.

26      [35]  It is unnecessary to reach the federal defendants'
   arguments as to count III and the Lytton Rancheria because only
   the state defendants are named in that count.

51

separate indication of congressional intent to make agency action reviewable under the APA."   <u>Japan Whaling Ass'n v. American Cetacean Soc'y</u>, 478 U.S. 221, 230 n.4 (1986).   Because of this "strong presumption," <u>Bowen v. Michigan Acad. of Family Physicians</u>, 476 U.S. 667, 670 (1986), the court may find that IGRA and the Johnson Act "preclude judicial review" according to § 701(a)(1) only if there is "clear and convincing evidence" that Congress intended to foreclose the availability of an APA remedy. <u>Block v. Community Nutrition Inst.</u>, 467 U.S. 340, 348, 350 (1984).   The term "clear and convincing evidence," however, is something of a misnomer since it does not refer to a quantum of evidence "in the strict evidentiary sense."   <u>Id.</u> at 350. "Rather, the Court has found the standard met, and the presumption favoring judicial review overcome, whenever the congressional intent to preclude judicial review is 'fairly discernible in the statutory scheme.'"[36]   <u>Id.</u> at 351 (quoting <u>Ass'n of Data Processing Serv. Orgs., Inc. v. Camp</u>, 397 U.S. 150, 157 (1970)).   Specifically, the court should find the necessary intent to preclude review if review would permit plaintiffs to

---

[36]   According to <u>Community Nutrition Institute</u>, Congress' intent to overcome the presumption in favor of judicial review of agency action under § 701(a)(1) is revealed by "(1) specific statutory language, (2) specific legislative history, (3) contemporaneous judicial construction followed by congressional acquiescence, (4) the collective import of the legislative and judicial history of the statute, and (5) inferences drawn from the statutory scheme as a whole."   3 K. Davis & R. Pierce, Jr., <u>Administrative Law Treatise</u> § 17.8 at 153-54 (3d ed. 1994).   The court only considers inferences drawn from the statutory scheme because there is no suggestion or evidence that any of the other four categories noted in <u>Community Nutrition Institute</u> apply.

"evade the statutorily envisioned review mechanisms in favor of those established by the APA." Overton Power Dist. No. 5 v. O'Leary, 73 F.3d 253, 256 (9th Cir. 1996).

There is nothing in the relevant structure of IGRA or the Johnson Act to suggest that Congress intended to preclude the type of APA review sought here by the plaintiffs. Unlike Community Nutrition Institute where the availability of an APA cause of action for milk consumers would have undermined detailed procedures milk processors had to follow in order to challenge milk prices under the Agricultural Marketing Agreement Act of 1937, 7 U.S.C. § 601 et seq., allowing plaintiffs' APA claims will not frustrate the regulatory structure of either IGRA or the Johnson Act.[37] The federal defendants are correct that IGRA contemplates a multitude of specific causes of action that may be brought by specified entities or persons. See Seminole Tribe of Florida v. Florida, 181 F.3d 1237, 1248 (1999) (listing causes of action created by IGRA including 25 U.S.C. § 2710(d)(7)(A)(ii) (authorizing state or tribal suit to enjoin class III gaming conducted in violation of compact); 25 U.S.C. § 2710(d)(7)(A)(iii) (authorizing suit by Secretary of Interior to enforce procedures for conducting class III gaming); 25 U.S.C. § 2711(d) (authorizing tribal suit to compel Chairman of the NIGC

---

[37] Similarly, the federal defendants' reliance on Morris v. Gressette, 432 U.S. 491 (1977) for the proposition that litigation-induced delays in agency approval procedures might preclude judicial review is misplaced. (Fed. Defs.' Motion at 36). Unlike the sections of the Voting Rights Act reviewed in Morris, there are no comparable provisions in IGRA indicating congressional concern with timing or delay.

1    either to approve or to disapprove management contract); 25
2    U.S.C. § 2713(a)(2), (b)(2) (creating right to hearing before
3    NIGC regarding fine imposed or temporary closure ordered by
4    Chairman); 25 U.S.C. §§ 2713(c), 2714 (authorizing appeal to
5    district court of NIGC fines, permanent closure orders, and
6    certain other decisions)). But the inclusion of remedies in IGRA
7    for specific entities or persons only supports an inference that
8    Congress intended to preclude others from bringing the same kind
9    of claims under the APA. As the Court observed in Community
10   Nutrition Institute, 467 U.S. at 349, "when a statute provides a
11   detailed mechanism for judicial consideration of particular
12   issues at the behest of particular persons, judicial review of
13   those issues at the behest of other persons may be found to be
14   impliedly concluded."

15       Thus, the federal defendants' implicit reliance on the legal
16   maxim expressio unius est exclusio alterius -- the expression of
17   one implies the exclusion of others -- to argue that the
18   inclusion of specific remedies for some parties impliedly
19   precludes all other parties and all other APA claims is not
20   warranted. (Fed. Defs.' Motion at 33-35). The starting point of
21   preclusion analysis is "the strong presumption that Congress
22   intends judicial review of administrative action." Bowen, 476
23   U.S. at 670. This presumption is inconsistent with the federal
24   defendants' reliance on a robust expressio unius doctrine because
25   it would create the reverse presumption, one against APA review
26   for most statutes.

54

1    Nor have the federal defendants demonstrated that the
2  plaintiffs' APA claims would undermine IGRA or the Johnson Act.
3  Noticeably absent from the list of IGRA-created remedies is one
4  that addresses the type of claim brought by the plaintiffs -- a
5  mechanism for challenging the Secretary's approval of a compact
6  on the basis that the compact violates IGRA.[38]  In the absence of
7  an explicit remedy under IGRA, permitting plaintiffs to proceed
8  under the APA would not encourage parties to circumvent
9  statutorily envisioned review mechanisms, and, therefore, "the
10 general presumption favoring judicial review of administrative
11 action is controlling."[39]  Community Nutrition Institute, 467

12

13    [38]  Federal defendants concede in their Reply that they do
   not contest the plaintiffs' use of the APA to object to the
14 Secretary's actions on constitutional grounds.  (Fed. Defs.'
   Reply at 28).  See Webster v. Doe, 486 U.S. 592, 603 (1988)
15 (noting that Congress must be especially clear when it intends to
   foreclose judicial review of constitutional claims under a
16 particular statute).

17    [39]  The federal defendants' insistence that the absence of
   an implied private right of action under IGRA precludes the
18 plaintiffs' APA claims is equally unavailing.  (Fed. Defs.'
   Motion at 31).  The defendants are correct that there is no
19 evidence that Congress intended a private right of action to
   enforce IGRA.  Florida v. Seminole Tribe of Florida, 181 F.3d
20 1237, 1245-50 (11th Cir. 1999) (no private right of action under
   IGRA); Tamiami Partners v. Miccosukee Tribe of Indians, 63 F.3d
21 1030, 1049 (11th Cir. 1995) (same).  However, it is well-
   established that an APA claim is available even in the absence of
22 an implied private cause of action.  See Hein v. Capitan Grande
   Band of Diegueno Mission Indians, 201 F.3d 1256, 1260-61 (9th
23 Cir. 2000) (tribe lacked private right of action under IGRA but
   could proceed under APA); Oregon Natural Res. Council v. United
24 States Forest Serv., 834 F.2d 842, 851 (9th Cir. 1987) ("an
   implied private right of action under a violated statute is not a
25 necessary predicate to a right of action under the APA"); Rapid
   Transit Advocates, Inc. v. Southern California Rapid Transit
26 Dist., 752 F.2d 373, 377 (9th Cir. 1985) (same).  This is a
   predictable outcome because there is a strong presumption that
   Congress intended judicial review of agency action under the APA,

55

1  U.S. at 351.

2      For these reasons, the plaintiffs' claims under the APA are

3  not precluded by § 701(a)(1).[40]

4  B.   Section 701(a)(2)

5      In contrast to the strong presumption that agency action is

6  subject to judicial review under the APA, there is a contrary

7  presumption against judicial review of an agency's decision not

8  to undertake an enforcement action because such decisions are

9

10 _____

11 while courts presume that Congress did not intend implied private
   rights of action.  Compare Japan Whaling Ass'n, 478 U.S. at 230

12 n.4 (noting that right of action is available under the APA
   "absent some clear and convincing evidence of legislative intent

13 to preclude review") with Cannon v. University of Chicago, 441
   U.S. 677, 731 (1979) (Powell, J., dissenting)("Absent the most

14 compelling evidence of affirmative congressional intent, a
   federal court should not infer a private cause of action.").

15      [40]  The federal defendants argue that two cases, Jackson v.
   United States, 485 F.Supp. 1243 (D. Alaska 1980) and San Xavier

16 Dev. Auth. v. Charles, 237 F.3d 1149 (9th Cir. 2001), hold that
   the plaintiffs do not have a remedy under the APA because "there

17 is no substantive right for third party review of Indian
   contracts."  (Federal Defs.' Reply at 30).  Neither case,

18 however, states such a broad holding.  First, Jackson is not
   binding authority, and the court found that there was no APA

19 claim because the plaintiffs had not independently established
   subject matter jurisdiction.  Jackson, 485 F.Supp. at 1249.

20 Here, as in virtually all cases brought under the APA, "subject
   only to preclusion-of-review statutes created by Congress,"

21 federal jurisdiction is provided by 42 U.S.C. § 1331.  Califano
   v. Sanders, 430 U.S. 99, 106 (1977); Complaint at ¶ 2 (stating

22 that jurisdiction for the APA claim is based on 28 U.S.C. §
   1331); see also Robbins v. Reagan, 780 F.2d 37, 43 (D.C. Cir.

23 1985) (applying Califano; "district court always has jurisdiction
   to review federal administrative action under 28 U.S.C. § 1331").

24 Because neither IGRA nor the Johnson Act contains a preclusion of
   review provision, the court has subject matter jurisdiction under

25 28 U.S.C. § 1331, and the plaintiffs have a cause of action under
   the APA.  Second, San Xavier Development Authority, involved an

26 entirely different statutory scheme and, therefore, is not
   binding authority as to APA claims under IGRA.

1  generally committed to agency discretion.   <u>Heckler v. Chaney</u>, 470

2  U.S. 821 (1985) (no APA cause of action to review Food and Drug

3  Administration decision not to take enforcement actions under

4  Food, Drug and Cosmetic Act, 21 U.S.C. § 301 <u>et seq.</u>).   The logic

5  of <u>Chaney</u> is that judicial review of agency decisions not to take

6  enforcement action is generally precluded under § 701(a)(2)

7  because such decisions involve "a complicated balancing of a

8  number of factors which are peculiarly within [the agency's

9  expertise]" and because "review is not to be had if the statute

10  is drawn so that a court would have no meaningful standard

11  against which to judge the agency's exercise of discretion."   <u>Id.</u>

12  at 830.   Section 701(a)(2), however, represents "a very narrow

13  exception" to judicial review of administrative action.   <u>Citizens</u>

14  <u>to Preserve Overton Park v. Volpe</u>, 401 U.S. 402, 410 (1971).

15      Section 701(a)(2) and <u>Chaney</u> do not apply here for several

16  reasons, not the least of which is that plaintiffs do not

17  challenge an agency's failure to enforce a statute.  (Fed. Defs.'

18  Motion at 37-39).  Under IGRA, a class III gaming compact is not

19  valid until it is approved by the Secretary of the Interior and

20  published in the Federal Register.  <u>See</u> 25 U.S.C. §

21  2710(d)(3)(B).  In this case, the Secretary of the Interior

22  approved California's gaming compacts with the Indian tribes, and

23  it is this decision that is the subject of the plaintiffs' APA

24  claim.   (Complaint at ¶ 72) ("The approval of the Tribal-State

25  Compacts by the Federal Defendants' predecessors violates

26  IGRA.").   Therefore, because the plaintiffs seek review of agency

action, as opposed to a discretionary decision to forego enforcement of a statute, neither <u>Chaney</u> nor § 701(a)(2) bars review of the plaintiffs' claims.  <u>See</u> <u>Robbins</u>, 780 F.2d at 45 ("Th[e] requirement of an amplified level of discernible standards controlling the agency's discretion is not applied, however, where agency action not analogous to enforcement decisions is involved.").

The federal defendants also present an argument that is a variation on the traditional objection to judicial review under <u>Chaney</u>.  The argument is somewhat confusing but seems to go something like this: Because tribes with a compact are not parties to this lawsuit and are not bound by what the court decides, a ruling that the federal defendants' decision to approve the compacts was contrary to law could only be implemented at this point through the discretionary decision of the NIGC to enforce IGRA.  (Fed. Defs.' Motion at 37-39).  As a matter of APA law, this argument misses the mark because the plaintiffs do not currently seek judicial review of a decision to forego enforcement.  Further, the court should not reject the plaintiffs' APA claims based on the assumption that a federal agency might not enforce the law in some future proceeding.  <u>See</u> <u>supra</u> pp. 42-45.

What the federal defendants style as an invocation of the "committed to agency discretion" provision of § 701(a)(2) really amounts to a contention that the plaintiffs lack Article III standing because redressability depends on the discretionary

enforcement decisions of a third party and these decisions are not themselves the subject of review under the APA.

The Supreme Court considered, and rejected, a similar argument in Federal Election Comm'n v. Akins 524 U.S. 11 (1998). In Akins, the plaintiffs were voters who challenged the FEC's conclusion that under the Federal Election Campaign Act of 1971, 2 U.S.C. § 431, the American-Israel Political Action Committee ("AIPAC") was not a "political committee." A contrary determination would have given rise to various recordkeeping and disclosure requirements. The FEC argued that plaintiffs could not establish redressability because even if the Supreme Court reversed its decision, the FEC could still exercise its discretion and decline to pursue an enforcement action against AIPAC. Rejecting this argument the Court held that there was standing, because

> those adversely affected by a discretionary agency decision generally have standing to complain that the agency based its decision upon an improper legal ground. If a reviewing court agrees that the agency misinterpreted the law, it will set aside the agency's decision and remand the case--even though the agency . . . might later, in the exercise of its lawful discretion, reach the same result for a different reason.[41]

Id. at 24.

The Court's reasoning in Akins is equally applicable here.

---

[41] Although these statements were made specifically in the context of the causation requirement, the Court applied the identical analysis to the redressability question. Akins, 524 U.S. at 25 ("[f]or similar reasons, the courts in this case can 'redress' 'injury in fact'").

1  A decision that the Secretary of the Interior's approval of
2  California's gaming compacts was contrary to law might result in
3  continued class III gaming on Indian lands that can only be
4  stopped by the NIGC, an agency under the purview of the Secretary
5  of the Interior.  25 U.S.C. § 2704.  Under Chaney, the court
6  might be precluded from reviewing a decision of the NIGC to
7  refuse to take steps under IGRA against illegal tribal gaming.
8  However, even were this the case, this future contingency does
9  not destroy redressability for the plaintiffs' claim against the
10 Secretary's approval of gaming compacts.  Indeed, Akins
11 demonstrates that "[r]edressability does not require a plaintiff
12 to establish that the defendant agency will actually exercise its
13 discretion in any particular fashion in the future."  West
14 Virginia Highlands Conservancy v. Norton, 137 F.Supp.2d 687, 698
15 (S.D. W.Va. 2001); see also Animal Legal Defense Fund, Inc. v.
16 Glickman, 154 F.3d 426 (D.C. Cir. 1998) ("The Supreme Court's
17 recent decision in FEC v. Akins, moreover, rejects the possible
18 counter argument that the redressability element of
19 constitutional standing requires a plaintiff to establish that
20 the defendant agency will actually enforce any new binding
21 regulations against the regulated third party.").  For these
22 reasons, Chaney and § 701(a)(2) do not apply here to foreclose
23 judicial review of the federal defendants' actions.

24 C.   Section 702-Zone of Interest Test

25      Section 702 of the APA states that "[a] person suffering
26 legal wrong because of agency action, or adversely affected or

1   aggrieved by agency action within the meaning of a relevant

2   statute, is entitled to judicial review thereof." 5 U.S.C. §

3   702. The Supreme Court has interpreted § 702 "to impose a

4   prudential standing requirement in addition to the requirement,

5   imposed by Article III of the Constitution, that a plaintiff have

6   suffered a sufficient injury in fact." National Credit Union

7   Administration v. First National Bank & Trust Co., 522 U.S. 479,

8   488 (1998)("National Credit Union"). To demonstrate standing

9   under the APA, a plaintiff "must . . . show that the interests it

10  seeks to protect are 'arguably within the zone of interests to be

11  protected' by the statute in question." Yesler Terrace Cmty.

12  Council v. Cisneros, 37 F.3d 442, 445 (9th Cir. 1994) (quoting

13  Ass'n of Data Processing Serv. Orgs., Inc. v. Camp, 397 U.S. 150,

14  153 (1970)("Data Processing")).

15      The Court has indicated that there is no "clear rule for

16  determining when a plaintiff" falls within the zone of interests

17  to be protected by a statute. "[I]n applying the . . . test . .

18  . we first discern the interests 'arguably . . . to be protected'

19  by the statutory provision at issue; we then inquire whether the

20  plaintiff's interests affected by the agency action in question

21  are among them." National Credit Union, 522 U.S. at 488, 492.

22  However, "[t]he test is not meant to be especially demanding; in

23  particular, there need be no indication of congressional purpose

24  to benefit the would-be plaintiff." Clarke v. Securities Indus.

25  Ass'n, 479 U.S. 388, 399-400 (1987). Rather, "APA plaintiffs

26  need only show that their interests fall within the 'general

policy' of the underlying statute, such that interpretations of the statute's provisions or scope could directly affect them." Graham, 149 F.3d at 1004.

The plaintiffs' interests here are not so "marginally related to or inconsistent with the purposes implicit in the statute" that they lack prudential standing. Clarke, 479 U.S. at 399. The provision of IGRA in question, 25 U.S.C. § 2710(d)(1)(B), states that class III gaming activities are only lawful on Indian lands if such activities are "located in a State that permits such gaming for any purpose by any person, organization, or entity." Interpretation of this statutory language could directly affect plaintiffs' interests because, if plaintiffs' interpretation is correct, either the challenged compacts are invalid or plaintiffs must also be permitted to offer class III gaming. Either outcome directly affects their interests.

Moreover, by requiring that some gaming be permitted by the state as a precondition for a class III tribal gaming compact, § 2710(d)(1)(B), as interpreted by plaintiffs, arguably manifests a desire to foster some degree of competition, and plaintiffs are among the tribes' competitors.[42] The Court has repeatedly held

_____

[42] Although the zone of interests test may implicate the court's decision on the merits, it is important to remember that the two are distinct. See Von Aulock v. Smith, 720 F.2d 176, 185 (D.C. Cir. 1983) ("some inquiry into the merits is necessary in a variety of situations presenting justiciability questions--those involving, for example, the 'zone of interests' test for standing"). The court's finding that the plaintiffs fall within the zone of interests "arguably" sought to be protected by IGRA does not mean that the plaintiffs must also prevail on "the

that competitors fall within the zone of interests of provisions that are concerned with competition.[43]  See Data Processing, 397 U.S. 150; Arnold Tours, Inc. v. Camp, 400 U.S. 45 (1970)(per curiam); Investment Co. Inst. v. Camp, 401 U.S. 617 (1971); Clarke, 479 U.S. 388; National Credit Union, 522 U.S. 479.

In sum, it is at least arguable that the plaintiffs are among the competitors protected by the language of § 2710(d)(1)(B).  Accordingly, they have standing under the APA to challenge the Secretary's action.

---

argument" over statutory interpretation; "were that so, the zone of interests test would not merely implicate but would duplicate the merits."  National Coal Ass'n v. Hodel, 825 F.2d 523, 527 (D.C. Cir. 1987) (trade associations had standing to challenge restrictions on coal leasing under Mineral Leasing Act and whether Secretary of Interior considered competition; restrictions on leasing permissible and Secretary's consideration of competition adequate).  See, e.g., Clarke v. Securities Industry Ass'n, 479 U.S. 388 (1987) (finding standing but rejecting claim on the merits).  The zone of interest test merely determines if the plaintiff is entitled to seek relief under the APA.  Therefore, although the plaintiffs have an interest in competition that is arguably protected by IGRA and that permits them to bring a claim under the APA, this does not mean that they necessarily prevail on the merits.  In fact, they do not, although their claim is at least colorable.

    [43]  The federal defendants argue that Air Courier Conference v. Postal Workers, 498 U.S. 517 (1991), demonstrates that competitors lack prudential standing under the APA.  (Fed. Defs.' Reply at 25-26).  In that case, the Court held that the interest of postal workers in maximizing their employment opportunities was not within the zone of interests to be protected by the postal monopoly statutes.  Id. at 519.  However, as the Court explained in National Credit Union, the statute challenged in Air Courier Conference had exclusive purposes: to increase postal revenues and to ensure that postal services were provided in a manner consistent with the public interest.  National Credit Union, 522 U.S. at 498.  Because the Act's purposes were exclusive, the postal employees' claims could not fall within the zone of interests protected by the statute.  Id.  This essential aspect of Air Courier Conference is missing here.

VI.   Failure to Join Indian Tribes as Indispensable Parties

The final argument on the court's jurisdiction comes from amicus curiae California Nations Indian Gaming Association ("CNIGA").  CNIGA argues that the complaint must be dismissed in its entirety because the plaintiffs failed to join California's sixty-one Indian tribes who are necessary and indispensable parties under Fed. R. Civ. P. 19.  A two part test applies to motions to dismiss for failure to join necessary and indispensable parties.  Washington v. Daley, 173 F.3d 1158, 1167 (9th Cir. 1999).  First, the court must decide if the tribes are necessary to the suit.  If the tribes are necessary, and if they cannot be joined, the court must determine if they are "'indispensable' so that in 'equity and good conscience' the suit should be dismissed.  The inquiry is a practical one and fact specific, and is designed to avoid the harsh results of rigid application.  The moving party has the burden of persuasion in arguing for dismissal."  Makah Indian Tribe v. Verity, 910 F.2d 555, 558 (9th Cir. 1990) (citations omitted).  Because the tribes' interests are adequately represented by the Secretary, the court denies the motion to dismiss under Rule 19.

First, an absent party is necessary if complete relief is not possible among those already parties to the suit, or if the absent party has a "nonfrivolous claim" to a legally protected interest in the suit.  Shermoen v. United States, 982 F.2d 1312, 1317 (9th Cir. 1992); Fed. R. Civ. P. 19(a)(1), (2).  The Ninth Circuit has repeatedly held that "a district court cannot

1   adjudicate an attack on the terms of a negotiated agreement
2   without jurisdiction over the parties to that agreement."
3   Clinton v. Babbitt, 180 F.3d 1081, 1088 (9th Cir. 1999) (as party
4   to agreement with United States, complete relief impossible
5   without Hopi Tribe); see also Manybeads v. United States, 209
6   F.3d 1164, 1165 (9th Cir. 1995) (same). With respect to the
7   current compacts, the tribes have legal interests at stake in the
8   litigation since they will lose their compact rights to conduct
9   class III gaming if the plaintiffs prevail. See Washington v.
10  Daley, 173 F.3d at 1167 (holding that Indian tribes were
11  necessary parties in challenge to regulation promulgated by
12  Secretary of Commerce that increased tribes' fishing quota
13  because adverse ruling would terminate tribes' fishing rights).

14      However, although the tribes can claim a legal interest in
15  this lawsuit, they are not necessary parties because their legal
16  interest can be adequately represented by the Secretary.  (Id.)
17  ("As a practical matter, an absent party's ability to protect its
18  interest will not be impaired by its absence from the suit where
19  its interest will be adequately represented by existing parties
20  to the suit."). An existing party may adequately represent the
21  interests of an absent party if (1) the present party will
22  undoubtedly make all of the absent party's arguments, (2) the
23  present party is capable and willing to make the absent party's
24  arguments, and (3) the absent party would not offer any necessary
25  elements that the present parties would neglect. Shermoen, 982
26  F.2d at 1318. In general, the United States' trust obligations

to the Indian tribes, which the Secretary has a statutory duty to protect, 25 U.S.C. § 2710(d)(8)(B)(Secretary may disapprove compact if it violates trust obligations of the United States to Indians), United States v. Eberhardt, 789 F.2d 1354, 1360 (9th Cir. 1986) ("We hold that the general trust statutes in Title 25 do furnish Interior with broad authority to supervise and manage Indian affairs and property commensurate with the trust obligations of the United States."), satisfies the representation criteria and allows it to adequately represent the absent tribes "unless there exists a conflict of interest between the United States and the tribe." Southwest Ctr. for Biological Diversity v. Babbitt, 150 F.3d 1152, 1154 (9th Cir. 1998). However, for a conflict of interest to preclude a tribe's representation by the Secretary, there must be a "clear potential for inconsistency between the Secretary's obligations to the Tribes and its [other] obligations" that arises "in the context of th[e pending] case." Washington v. Daley, 173 F.3d at 1168-69 (holding that United States could adequately represent tribes' interests because there was no direct conflict between tribes and the United States, or between the tribes themselves).

Amicus curiae CNIGA has not carried its burden of demonstrating an actual conflict of interest in the pending litigation that would prevent the United States from adequately representing California's Indian tribes.[44]  "In fact, the

---

[44]   Although a novel argument, the Model Rules of Professional Conduct are not relevant to determining whether an existing party's interests conflict with an absent party's

Secretary and the Tribes have virtually identical interests in this regard." Id. at 1167-68.  The Secretary and California's Tribes agree on the central issue at hand: Exclusive class III gaming compacts for Indian tribes are consistent with IGRA and the Equal Protection Clause.  Indeed, even the Indian tribes that have not yet signed class III gaming compacts agree with the Secretary's position in this regard.[45]  Thus, CNIGA has "failed to demonstrate how . . . a conflict might actually arise in the context of this case." Id. at 1168.

Likewise, CNIGA has not demonstrated that any of the remaining alleged conflicts are likely to arise in the context of this case.  Most relate to the United States' exclusive jurisdiction to enforce gaming laws under 18 U.S.C. § 1166.  CNIGA, however, fails to explain how pending or past enforcement actions would prevent the Secretary from adequately representing the tribes in a case that does not even remotely bear on the United States' enforcement power.  See Southwest Center for Biological Diversity, 150 F.3d at 1154 (reversing district court's decision that United States could not represent tribes

interests.  See CNIGA Amicus Brief at 12-13.  No court has adopted this approach to determining the adequacy of representation under Fed. R. Civ. P. 19.

[45]  Similarly, the Secretary can represent the tribes who are parties to In re Indian Gaming Related Cases, 147 F.Supp.2d 1101 (N.D. Cal. 2001), because they do not challenge the ability of tribes to exercise exclusive class III gaming rights.  Further, the plaintiffs also lack standing to challenge the assessment provisions that are at issue in that case.  See infra pp. 93-95.  Thus, any potential for conflict between the tribes and the Secretary on this score will not ripen into an actual conflict.

1  due to potential conflict noting that court identified "no
2  argument the United States would not or could not make on the
3  Community's behalf").  Moreover, CNIGA's position supports the
4  improbable conclusion that § 1166 prevents the United States from
5  ever representing tribes in IGRA cases.  See Washington v. Daley,
6  173 F.3d at 1168 (United States could represent Indian tribes
7  notwithstanding its enforcement role under the Fishery
8  Conservation and Management Act, 16 U.S.C. §§ 1858-1860).

9      CNIGA's final argument is equally unpersuasive.  It contends
10 that the United States agreed that the BIA would cease its
11 acquisition of the San Pablo land in trust for the Lytton Band
12 without an injunction and thereby gained more time to brief this
13 case by trading the Lytton Band's statutory rights to have the
14 BIA proceed unless enjoined.  However, CNIGA overlooks that this
15 "strategy" was adopted to better represent the position of the
16 tribes, including the Lytton Band.  In any event, future compacts
17 are not part of this case given the court's ruling on standing.

18     For these reasons, the court finds that CNIGA failed to
19 carry its burden of demonstrating that California's Indian tribes
20 are necessary and indispensable parties.[46]

21                        VII.  IGRA[47]

22

23 [46]  Because the court finds that the tribes are not
   necessary parties, it does not consider whether they are
24 indispensable parties under Fed. R. Civ. P. 19(b).  See
   Washington v. Daley, 173 F.3d at 1169 ("indispensable" analysis
25 after determining that absent party is not
   necessary).

26 [47]  It is unnecessary to address the state defendants'
   argument that the plaintiffs lack a private right of action to

68

1      This case presents a novel issue of statutory
2 interpretation.  Section 2710(d)(1)(B) allows for class III
3 tribal gaming only if "located in a State that permits such
4 gaming for any purpose by any person, organization, or entity."
5 The issue here is whether, for purposes of IGRA, a state
6 constitutional amendment may "permit" Indian tribes to engage in
7 otherwise prohibited forms of class III gaming, notwithstanding
8 exclusive federal jurisdiction over Indian gaming; and, if so,
9 whether a resulting class III gaming monopoly by tribes with
10 compacts comports with IGRA's "any person, organization, or
11 entity" requirement?  Employing the traditional tools of
12 statutory construction -- the statute's plain language governs
13 unless it is ambiguous, legislative history should only be
14 consulted if the plain language is ambiguous or renders a
15 tortured reading of the statute, and statutes benefitting Indian
16 tribes are construed liberally in their favor -- and in deference
17 to the Secretary's interpretation, the court finds that under
18 Proposition 1A, California lawfully permitted tribes with
19 compacts to offer class III gaming, and that the compacts do not
20 violate IGRA's "any person, organization, or entity" provision.
21 Rumsey Indian Rancheria of Wintun Indians v. Wilson, 64 F.3d
22 1250, 1257 (9th Cir. 1996) (applying traditional canons of
23 statutory interpretation to IGRA).

24

25 enforce IGRA because their claims are brought under § 1983 and
the APA.  See, e.g., Hein v. Capitan Grande Band of Diegueno
26 Mission Indians, 201 F.3d 1256, 1260-61 (9th Cir. 2000); State of
Florida v. Seminole Tribe, 181 F.3d 1237, 1245-50 (11th Cir.
1999).

A. Does California "Permit" Class III Gaming?

Proposition 1A authorizes the Governor to enter into class III gaming compacts with Indian tribes "in accordance with federal law." Plaintiffs argue that California may not rely on Proposition 1A to "permit" tribes to offer class III gaming because states only acquire jurisdiction over gambling on Indian lands after executing a valid compact under IGRA. (Pls.' Motion at 23-24; Pls.' Reply at 9). According to plaintiffs, this logical conundrum deprives Proposition 1A of "permission" status under § 2710(d)(1)(B) of IGRA. Although not without force, for several reasons, the court is not persuaded by this argument.

To begin with, Proposition 1A unambiguously authorizes the Governor and the State Legislature to conclude class III gaming compacts with Indian tribes subject to the terms of federal law, notwithstanding contrary provisions of state law which generally prohibit such gaming. Proposition 1A explicitly excepts Indian gaming from provisions of state law that otherwise prohibits slot machines, lottery games, and banking card games. And it authorizes compacts and gaming under these compacts against the backdrop of, or by incorporating, federal law, specifically, IGRA. In this sense, Proposition 1A permits tribal gaming under IGRA. Of course, outside of the context of IGRA, California cannot unilaterally legalize tribal gaming. The issue here, however, is whether it may, for purposes of § 2710(d)(1), "permit" such gaming within the general context of IGRA. This is a question of statutory construction.

1    A state's affirmative permission to tribes to engage in

2  gaming within the structure of IGRA may not have been on the

3  forefront of what Congress had in mind in enacting IGRA and §

4  2710(d)(1)(B).  But it is a kind of permission that is not

5  foreclosed by the language of IGRA, and fits well within its

6  plain language.  In enacting IGRA, Congress employed capacious

7  language to clarify the situations in which it would be lawful

8  for Indian tribes to offer class III gaming.  Section

9  2710(d)(1)(B) reflects this approach.  It states that class III

10  gaming activities are lawful on Indian lands only if the

11  activities are "located in a State that permits such gaming for

12  any purpose by any person, organization, or entity."  25 U.S.C. §

13  2710(d)(1)(B).  As discussed in the next section, the "any

14  purpose" "any person" language suggests that this prerequisite is

15  easily met.  See infra pp. 73-75.  The Act does not define

16  "permits"; neither placing restrictions on the word nor otherwise

17  limiting its meaning.  Section 2710(d)(1)(B) does not say

18  "permits such gaming independently of IGRA for any purpose by any

19  person, organization, or entity."  It does not say "permits such

20  gaming for any purpose by any person, organization, or entity

21  other than Indian tribes."  And it is precisely because Congress

22  did not write the Act in either of these ways that California,

23  subject to the Secretary's approval, may "permit" class III

24  gaming within the structure of IGRA, even though the permission

25  is not entirely independent of IGRA, and even though IGRA

26  prevents states from unilaterally legalizing tribal gaming.  In

short, the statute is written broadly, and it is consistent with the co-operative federalism at the heart of IGRA to allow the state to "permit" tribal gaming under the Act by exempting the tribes from state prohibitions on banked gaming and slot machines.[48]

Plaintiffs argue that this construction negates the state permission requirement of § 2710(d)(1)(B) because a state that satisfies the compact requirement, § 2710(d)(1)(C), would also be one that "permits such gaming." See Mountain States Tel. & Tel. Co. v. Pueblo of Santa Ana, 472 U.S. 237, 249 (1985) (noting "'the elementary canon of construction that a statute should be interpreted so as not to render one part inoperative'") (quoting Colautti v. Franklin, 439 U.S. 379, 392 (1979)). Two courts have held that a compact entered into under § 2710(d)(1)(C), does not satisfy the state permission requirement of § 2710(d)(1)(B). Citizen Band Potawatomi Indian Tribe v. Green, 995 F.2d 179, 181 (10th Cir. 1993); American Greyhound Racing, 146 F.Supp.2d 1012, 1067-69 (D. Ariz. 2001).

However, unlike in Green and American Greyhound Racing, California does not rely on the compacts themselves for the purpose of permitting class III gaming. Separate from the

---

[48]    Furthermore, this interpretation of "permit" is consistent with the Ninth Circuit's construction of the term, as employed in IGRA, to mean "'[t]o suffer, allow, consent, let; to give leave or license; to acquiesce by failure to prevent, or to expressly assent or agree to the doing of an act.'" Rumsey, 64 F.3d at 1257 (quoting from Black's Law Dictionary). Here, by constitutional amendment, California "permits" class III gaming through the compacting procedure as set forth in IGRA.

1  compacts, by constitutional amendment, California specifically
2  exempted Indian tribes from the State's general gambling
3  prohibitions, and granted them permission.  Although the vehicle
4  for California's exemption, Proposition 1A, integrates and
5  depends on the successful conclusion of gaming compacts,
6  Proposition 1A is still distinct from the compacts.  For all of
7  these reasons, and in deference to the Secretary's
8  interpretation, see infra pp. 83-86, the court finds that by
9  Proposition 1A, California "permits" class III gaming as required
10 by IGRA.

11 B.   Any Person, Organization, or Entity

12      Plaintiffs further contend that because California only
13 permits Indian tribes to offer class III gaming activities, it is
14 not a state that "permits such gaming for any purpose by any
15 person, organization, or entity."  (Pls.' Motion at 18).   25
16 U.S.C. § 2710(d)(1)(B).  According to the plaintiffs'
17 interpretation of § 2710(d)(1)(B), a state cannot satisfy the
18 "any person, organization, or entity" requirement unless the
19 state "permits such gaming for non-Indians."  (Pls.' Motion at
20 22).  Plaintiffs interpret "any" as "every," as opposed to "any
21 one."  This argument fails for several reasons.

22      To begin with, as already noted, the statute's plain
23 language does not support the plaintiffs' reading of the "any
24 person, organization, or entity" requirement.  Congress did not
25 say that a state had to permit class III gaming activities for
26 any non-Indian purpose for any non-Indian person, organization,

or entity.  Instead, as with the word "permits," Congress structured the requirement to provide states and tribes with maximum flexibility to fashion a class III gaming compact.

The failure of the plaintiffs' argument is evident in Congress' use of "any" as a modifier for the class III gaming that a state must permit before a tribe may enter into a compact. The word "any" can mean "every" or "one."  However, interpreting "any" in § 2710(d)(1)(B) to mean "every" must be rejected.  If IGRA required that a tribe could only enter a compact if located in a state that permitted such activities for every purpose by every person, organization, or entity, no tribe would be allowed to enter into a class III gaming compact because all states impose at least some limits on who can offer gaming and for what purpose.  Therefore, § 2710(d)(1)(B) is best understood as allowing class III gaming compacts in states that permit that kind of gaming for at least one purpose, by at least one person, organization, or entity.  Because California permits class III gaming by tribes with compacts under Proposition 1A, the State also satisfies § 2710(d)(1)(B)'s "any purpose by any person, organization, or entity" requirement.  See American Greyhound Racing, 146 F.Supp.2d at 1067 ("[t]he State must first legalize a game, even if only for tribes, before it can become a compact term").

Finally, plaintiffs contend that this issue is governed by the Ninth Circuit's ruling in Rumsey Indian Rancheria of Wintun Indians v. Wilson, 64 F.3d 1250 (9th Cir. 1996).  In Rumsey, the

1  court observed that "a state need only allow Indian Tribes to
2  operate games that others can operate, but need not give tribes
3  what others cannot have." Id. at 1258. Rumsey settled the
4  question of whether a state must negotiate class III gaming
5  compacts with Indian tribes when the state does not permit those
6  activities for anyone.[49] The decision does not address the issue
7  presented here -- whether the state may negotiate class III
8  gaming compacts with Indian tribes even if the state does not
9  permit those activities for non-Indians. Plaintiffs' argument
10 that this "is a distinction without a difference," simply
11 restates their position that a state may not affirmatively permit
12 Indian tribes to engage in class III gaming without opening up
13 such gaming to everyone else. Neither the "any person,
14 organization, or entity" requirement nor Rumsey supports the
15 plaintiffs' position.

16     In short, the court concurs with the Secretary that the
17 exclusive class II gaming compacts, as permitted by Proposition
18 1A, are within the plain language of IGRA.

19 C.  Legislative History

20     IGRA's plain language might obviate the need to rely on
21 legislative history. But to the extent that the language of §
22
23 _____

24     [49] Rumsey also held that "IGRA does not require a state to
    negotiate over one form of Class III gaming activity simply
25  because it has legalized another, albeit similar form of gaming.
    Instead, the statute says only that, if a state allows a gaming
26  activity 'for any purpose by any person, organization, or
    entity,' then it also must allow Indian tribes to engage in that
    same activity." Rumsey, 64 F.3d at 1258.

2710(d)(1)(B) might be ambiguous, a review of the legislative history tends to support the Secretary's construction of IGRA. See <u>Wilshire Westwood Assoc. v. Atlantic Richfield Corp.</u>, 881 F.2d 801, 805 (9th Cir. 1989) (noting that plain meaning of statute rendered legislative history unnecessary but that legislative history supported plain meaning construction).  The legislative history is silent on the precise dispute here concerning the construction of § 2710(d)(1)(B).  But it does suggest that Congress had three overriding purposes concerning the relationship between the tribes and the states: (1) provide the state with regulatory authority over class III gaming through the compact procedure; (2) permit the states and tribes a considerable degree of flexibility in negotiating the terms on which class III gaming would occur; and (3) ensure the tribes that the states would not bar class III gaming on Indian land, while at the same time permitting others to engage in such gaming elsewhere in the state.  The Secretary's interpretation of § 2710(d)(1)(B), which would allow to California the flexibility to permit class III gaming only on Indian lands, is consistent with these three purposes.

In the five years before IGRA was passed, at least six bills were introduced in Congress for the purpose of regulating Indian gaming and a similar number of hearings were held. By 1987, however, only two such bills were under serious consideration, S.

555, 100th Cong. (1987) and S. 1303, 100th Cong. (1987).[50]   Both

bills incorporated the "class" approach to regulating Indian

gaming present in the final version of IGRA.   The primary

difference between the two bills was in how they regulated

gaming.   Under S. 555, a tribe seeking to engage in class III

gaming would cede jurisdiction to the state in which its lands

were located and the state would then assume primary regulatory

responsibility.   The bill provided that an Indian tribe could

offer a class III gaming activity

> otherwise legal within the State where such
> lands are located . . . where the Indian tribe
> requests the Secretary [of the Interior] to
> consent to the transfer of all civil and
> criminal jurisdiction . . . pertaining to the
> licensing and regulation of gaming over the
> proposed gaming enterprise to the State within
> which such gaming enterprise is to be located
> and the Secretary so consents.

S. 555, 100th Cong. § 11(d)(2)(A).

In contrast, under S. 1303, the federal government would

have assumed responsibility for regulating class III gaming,

"where such Indian gaming is located within a State that permits

such gaming for any purpose by any person, organization or

entity."   S. 1303, 100th Cong. § 10(b).   In order to offer class

III gaming, S. 1303 required tribes to adopt a class III

ordinance which had to be approved by the Chairman of the

National Indian Gaming Commission.   After approving a tribe's

class III gaming ordinance, the Chairman would "adopt a

---

[50]   S. 1303 was identical to H.R. 2507, 100th Cong. (1987).
S. 555 was based on H.R. 1920, 99th Cong. (1985).

1  comprehensive regulatory scheme for such gaming activity . . .

2  after consultation with the affected Indian tribe or tribes and

3  with the appropriate officials of the State."   Id. § 12(e)(1).

4  Further, S. 1303 specified that "[t]he regulations adopted

5  pursuant to this subsection shall be identical to those provided

6  for the same activity by the State within which such Indian

7  gaming activity is to be conducted which is applicable to a State

8  licensee subsequent to the issuance of such license."   Id. §

9  12(e)(2).

10      Both S. 555 and S. 1303 met with considerable opposition.

11  States which "[h]istorically . . . had the primary responsibility

12  for establishing and enforcing public policies regarding liquor

13  and gambling because these matters have such a particularly

14  localized impact," did not want to cede jurisdiction to regulate

15  tribal gaming within their borders and therefore opposed S. 1303.

16  *Gaming Activities on Indian Lands and Reservations: Hearing*

17  *Before the Senate Select Comm. on Indian Affairs on S. 555 to*

18  *Regulate Gaming on Indian Lands and S. 1303 to Establish Federal*

19  *Standards and Regulations for the Conduct of Gaming Activities on*

20  *Indian Reservations and Lands, For Other Purposes*, 100th Cong.

21  510 (1987) (letter of John Van de Kamp, Attorney General, State

22  of California)(hereinafter "*Hearings on S. 555 and S. 1303*").

23  States feared that the federal government might permit tribes to

24  offer forms of gambling otherwise prohibited under state law and

25  opposed by the state, opening the door "for the tribes on the

26  reservation to become an island" where state law would not apply

1   and could not reach. Id. at 80 (statement of Sen. John Melcher,

2   Member, Senate Select Comm. on Indian Affairs). For their part,

3   most Indian tribes opposed S. 555 because it gave the states such

4   extensive regulatory authority.[51]

5      Faced with a deadlock over whether the states or the federal

6   government would have jurisdiction to regulate class III gaming

7   by Indian tribes, Congress inserted the compact provision into

8   the final version of S. 555. See 134 Cong. Rec. H8146-01 (daily

9   ed. September 26, 1988) (statement of Rep. Udall) (noting that

10   Congress had been unable to reach earlier compromise due to

11   "conflict between the right of tribal self-government and the

---

14   [51] Most tribes actually opposed both bills and believed that any regulation of tribal gaming was "a gross infringement upon tribal sovereignty." Hearings on S. 555 and S. 1303, at 496 (letter of Edgar Bowen, Tribal Chief/Chairman, Confederated Tribes of Coos, Lower Umpqua, and Siuslaw Indians); see also id. at 497-99 (letter of Wendell Chino, President, Mescalero Apache Tribe); id. at 500-01 (letter of Joseph Ely, Tribal Chairman, Pyramid Lake Paiute Tribal Council); id. at 502 (letter of John Hair, Chief, United Keetoowah Band of Cherokee Indians in Oklahoma); id. at 508 (letter of Mark Perrault, Chairman, Keweenaw Bay Indian Community); S. Rep. No. 100-446, at 4 (1988), reprinted in 1988 U.S.C.C.A.N. 3071, 3074 ("Tribes generally opposed any effort by the Congress to unilaterally confer jurisdiction over gaming activities on Indian lands to States and voiced a preference for an outright ban of class III games to any direct grant of jurisdiction to States."). Tribes that expressed a preference were strongly opposed to state jurisdiction. See Hearings on S. 555 and S. 1303, at 104 (Statement of Hon. William Houle, Chairman, Fon du Lac Band of Lake Superior Chippewas and Chairman, National Indian Gaming Association) ("National Indian Gaming Association only supports legislation, however, that does not transfer any jurisdiction to State government over Indian people, their activities, or their lands."); id. at 107 (Statement of Herman Agoyo, Chairman, All Indian Pueblo Council) ("Although we support Federal legislation to regulate Indian controlled gaming, we do not and will not support State jurisdiction.").

desire for State jurisdiction over gaming activity on Indian lands"). The Senate Committee Report that accompanied passage of IGRA explains the role of the compacts in balancing the interests of the states and the tribes:

> After lengthy hearings, negotiations, and discussions, the Committee concluded that the use of compacts between tribes and states is the best mechanism to assure that the interests of both sovereign entities are met with respect to the regulation of complex gaming enterprises. . . . The Committee notes the strong concerns of states that state laws and regulations relating to sophisticated forms of class III gaming be respected on Indian lands where, with few exceptions, such laws and regulations do not now apply. The Committee balanced these concerns against strong tribal opposition to any imposition of State jurisdiction over activities on Indian lands. The Committee concluded that the compact process is a viable mechanism for settling various matters between two equal sovereigns.

S. Rep. No. 100-446, at 13 (1988), *reprinted in* 1988 U.S.C.C.A.N. 3071, 3083. Therefore, by giving the states a primary role in the regulatory oversight of tribal gaming, while at the same time permitting tribes to sue states that refused to enter into negotiations for class III gaming compacts, the compact provision sought to satisfy both the states' desire to regulate and the tribes' concern that state regulation under S. 555 might preclude all tribal gaming. See S. Rep. No. 100-446, at 14 (1988), *reprinted in* 1988 U.S.C.C.A.N. 3071, 3084 ("[T]he issue before the Committee was how best to encourage States to deal fairly with tribes as sovereign governments. The Committee elected, as the least offensive option, to grant tribes the right to sue a

State if a compact is not negotiated and chose to apply the good faith standard as the legal barometer for the State's dealings with tribes.").

As to the language in § 2710(d)(1)(B) at issue here, the legislative history is silent.  There is no explicit discussion of the "permit" or "any person" formulation in the committee hearings or reports.  Perhaps the most direct inference may be drawn from Congress' decision to include the current formulation of § 2710(d)(1)(B) which comes from S. 1303, even though S. 555 was the basis for most of the final version of IGRA.  The comparable provision in S. 555 permitted class III tribal gaming where "otherwise legal within the State where such lands are located."  This formulation would seem to block a state from permitting tribal gaming while otherwise prohibiting gaming by others.  But this language was not carried over into IGRA, perhaps suggesting that Congress did not intend to so limit the states or the tribes.[52]

It is fair to conclude from the legislative history that Congress was not concerned about the situation in which a state and the tribes together affirmatively sought to foster exclusive

_____

[52]  Plaintiffs attempt to put the best face on IGRA's adoption of the "permits such gaming for any purpose to any person" language from S. 1303 rather than the "otherwise legal" language of S. 555.  Plaintiffs argue that because the state permission language originated in S. 1303, which provided for exclusive federal regulation of class III gaming and which lacked the State-Tribal compact procedure, it must have referred only to gambling that was permitted on non-Indian land.  But the language was taken from S. 1303 and substituted into S. 505 which did not provide for exclusive federal regulation.

class III gaming on tribal lands.  This was not the context in which Congress acted; rather, Congress faced a situation in which the states were insisting on their right to control or prohibit and the tribes were insisting on their right to be free from state regulation.  While IGRA's legislative history does not suggest that Congress specifically contemplated a State's support of a monopoly for tribal gaming, Proposition 1A and the compacts here are nevertheless consistent with the overarching concerns that led to the IGRA compromise: The State gains flexible regulatory authority while class III gaming by the tribes is protected from discrimination by the State.

Further, California's decision to "permit" tribes to operate class III gaming facilities within the context of IGRA and the compacts, while denying those rights to other persons, organizations, and entities, is a policy judgment, which whether one agrees with it or not, does not conflict with IGRA's goal of maintaining state authority while protecting Indian gaming from discrimination.  By contrast, to interpret IGRA to require the states to chose between no class III gaming anywhere and class III gaming everywhere would not further any of IGRA's goals and would limit the states' authority and flexibility without any resulting benefit to the tribes.

Finally, passing references in the legislative history to achieving "a fair balancing of competitive economic interests" and to developing a uniform "regulatory and jurisdictional pattern" provide little support to plaintiffs' position.

Congress' expressed concern about competition was to ensure that the tribes, not other parties, could compete with any group operating under a state gambling license.  See S. Rep. No. 100-446, at 13 (1988), *reprinted in* 1988 U.S.C.C.A.N. 3071, 3083 ("It is the Committee's intent that the compact requirement for class III not be used as a justification by a State for excluding Indian tribes from such gaming or for the protection of other State-licensed gaming enterprises from free market competition with Indian tribes.").  Further, the discussion of consistent regulation was simply part of Congress' goal of extending state regulatory authority to Indian lands so that these lands would not become islands free from state oversight.[53]

D.   Deference to the Secretary's Interpretation

In interpreting IGRA the court has given substantial deference to the Secretary's understanding of IGRA as expressed in her approval of the compacts.  This deference is appropriate

---

[53]   There are several flaws in plaintiffs' argument that § 2710(d)(1)(B) precludes California from granting tribes exclusive class III gaming rights because Congress intended that such gaming would only take place in states with a history of regulating similar activities.  (Pls.' Motion at 30-33). When Congress drafted IGRA, it did not restrict class III gaming to states with such experience.  Because it could lead to the untenable result in which states without this regulatory experience would be precluded from simultaneously granting gaming rights to Indians and non-Indians alike, such an interpretation of § 2710(d)(1)(B) is contrary to Congress' interest in preserving state sovereignty and providing tribes with an opportunity to develop gaming operations.  Furthermore, Congress recognized that not every state compact would confer exclusive authority to regulate class III gaming on preexisting state regulatory bodies.  See S. Rep. No. 100-446, at 13-14 (1988), *reprinted in* 1988 U.S.C.C.A.N. 3071, 3083-84.

under <u>Chevron U.S.A. v. Natural Res. Def. Council</u>, 467 U.S. 837,
842-45 (1984).  First, there is no explicit direction from
Congress as to whether a state may "permit" tribal gaming within
the context of IGRA, or whether a resulting class III gaming
monopoly violates IGRA.  <u>Id.</u> at 843.  Congress was understandably
not focused on the situation in which the states and tribes
agreed to exclusive class III Indian gaming rights.  <u>Yang v.
I.N.S.</u>, 79 F.3d 932, 935 (9th Cir. 1996) (applying traditional
methods of statutory interpretation to determine if Congress
spoke to an issue under <u>Chevron</u> step one).  Therefore, because
"Congress has left a gap for the administrative agency to fill,
[the court] proceed[s] to step two" of <u>Chevron</u>.  <u>Zimmerman v.
Oregon Dep't of Justice</u>, 170 F.3d 1169, 1173 (9th Cir. 1999).

Second, for the reasons already stated, the Secretary's
interpretation of IGRA is reasonable.  <u>Chevron</u>, 467 U.S. at 843.
The Secretary's interpretation is consistent with the statute's
language and it complements IGRA's legislative history by
balancing state and tribal sovereignty and interests.  Moreover,
although the Ninth Circuit gives priority to <u>Chevron</u> over the
rule of interpretation that statutes enacted for the benefit of
Indian tribes should "be construed liberally in favor of the
Indians, with ambiguous provisions interpreted to their benefit,"
the two doctrines here point to the same outcome.  <u>Navajo Nation
v. Dep't of Health and Human Serv.</u>, 285 F.3d 864, 870 (9th Cir.
2002) (quoting <u>Montana v. Blackfeet Tribe of Indians</u>, 471 U.S.
759, 766 (1985)); <u>Williams v. Babbitt</u>, 115 F.3d 657, 663 n.5 (9th

1  Cir. 1997).

2       Also, although the Secretary's interpretation came in the

3  form of a letter, and subsequent publication of approval in the

4  Federal Register, Chevron deference still applies because the

5  Secretary's letter "was not an 'opinion letter,' but, rather, a

6  final, albeit informal, adjudication on the merits."   Navajo

7  Nation, 285 F.3d at 871.   Indeed, as in Navajo Nation where the

8  Ninth Circuit held that a similar letter constituted an informal

9  adjudication that warranted Chevron deference, "Congress

10 delegated to the Secretary the authority to adjudicate in this

11 manner."   25 U.S.C. § 2710(d)(8)(A), (D) (authorizing Secretary

12 to approve compact and requiring publication of approval in

13 Federal Register).   Moreover, the Secretary's letter explained

14 the basis for her approval and why she found that the compacts

15 were consistent with IGRA and equal protection.[54]   (See Letter

16 from Kevin Grover, May 5, 2000, Exh. B to Complaint).

17      The Secretary is responsible for administering IGRA and

18 reviewing class III gaming compacts, and her interpretation of

19 the statute is entitled to a degree of deference.[55]

20

21      [54]   The Secretary's approval specifically notes that the
   compacts limit gaming to "the Tribes' reservation land;" that
22 through Proposition 1A, "Californians amended their state's
   constitution to permit the Governor to compact with Indian
23 tribes, subject to ratification by the State Legislature;" and
   that granting tribes exclusive class III gaming rights "in no way
24 violates the equal protection provisions of the United States
   Constitution."   (Letter from Kevin Grover, May 5, 2000, Exh. B to
25 Complaint).

26      [55]   Citing Williams v. Babbitt, 115 F.3d 657 (9th Cir. 1997),
   plaintiffs contend that the Secretary's interpretation of IGRA
   should be rejected because it raises a difficult constitutional

85

1  E.    Conclusion

2      Although the issue is not free from doubt, because of the

3  statutory presumption in favor of Indian tribes, the deference

4  owed to the Secretary's interpretation, and the Act's language

5  and legislative history, the court concludes that California's

6  compacts with the Indian tribes do not violate IGRA.[56]

7                    VIII.   Equal Protection

8      The final issue is whether California's compacts, and their

9  approval by the Secretary, violate the Due Process and Equal

10 Protection Clauses of the Fifth and Fourteenth Amendments.[57]

11  _____

12 question.  (Pls.' Motion at 33-34; Pls.' Reply at 16-17).
   However, "the 'constitutional doubt' canon does not apply
13 mechanically whenever there arises a significant constitutional
   question the answer to which is not obvious."  Almendarez-Torres
14 v. United States, 523 U.S. 224, 239 (1998).  Rather, the rule
   applies "[o]nly if the agency's proffered interpretation raises
15 serious constitutional concerns."  Williams, 115 F.3d at 662
   (emphasis in original).  Although the Secrretary's interpretation
16 of IGRA raises a constitutional question, it is not sufficiently
   serious to require a different reading of the statute.  Under
17 Morton v. Mancari, 417 U.S. 535 (1974), preferences in favor of
   Indian tribes are classified as political, not racial, and
18 therefore are reviewed deferentially.  See infra pp. 87-91.
19     Moreover, the preference accorded to tribes differs from the
   preference found to raise a grave constitutional question in
20 Williams v. Babbitt.  The preference in Williams was given to
   Indians as individuals and applied on non-Indian lands.  115 F.3d
21 at 664.  Here the preference is given to tribes and applies only
   to the lands within the tribes' sovereignty.  25 U.S.C. §
22 2710(d)(1).

23     [56]  The same analysis applies to the plaintiffs' claims
   under the Johnson Act, 15 U.S.C. § 1175.  California satisfies
24 IGRA's waiver provision of the Johnson Act, 25 U.S.C. §
   2710(d)(6), see supra p. 9 n.8, because California both makes
25 gambling devices legal through Proposition 1A and the compacts,
   and it has Tribal-State compacts in effect.

26     [57]  For purposes of clarity, references to "equal
   protection" or the "Equal Protection Clause" encompass both

                              86

1  Plaintiffs argue that the compacts and Proposition 1A should be
2  evaluated under the strict scrutiny standard, rather than the
3  modest, deferential standard of review from Morton v. Mancari,
4  417 U.S. 535 (1974).  (Pls.' Motion at 35-49).  Further,
5  plaintiffs argue that even if the Mancari standard applies, the
6  compacts and Proposition 1A violate equal protection because they
7  are not rationally related to the furtherance of Congress' trust
8  obligation to Indian tribes and to uniquely Indian interests.
9  (Id. at 49-54).  For the following reasons, the court concludes
10 that Mancari does apply, and that the compacts are rationally
11 related to Congress' trust obligation.

12     In Morton v. Mancari, the Supreme Court upheld a statutory
13 hiring preference for Indians in the Bureau of Indian Affairs
14 ("BIA").  417 U.S. 535 (1974).  The Court noted that Indian
15 tribes have a unique status under federal law as quasi-sovereign
16 entities and that laws enacted on their behalf reflect political
17 rather than racial classifications.  Id. at 553-54.
18 Consequently, the Court applied a deferential standard of review
19 and upheld the BIA hiring preference noting that it was
20 "reasonably and directly related to a legitimate, nonracially
21 based goal," tribal self-government.  Id. at 554.  The Court tied
22 its equal protection analysis to the tribes' special status and
23
24 plaintiffs' claim against the federal defendants under the Due
   Process Clause of the Fifth Amendment as well as plaintiffs'
25 Fourteenth Amendment claim against the state defendants.  See
   Adarand Constructors, Inc. v. Pena, 515 U.S. 200, 201 (1995)
26 (noting "congruence" principle: "'Equal protection analysis in
   the Fifth Amendment area is the same as that under the Fourteenth
   Amendment.'") (quoting Buckley v. Valeo, 424 U.S. 1, 93 (1976)).

the federal government's special trust obligation: "As long as the special treatment can be tied rationally to the fulfillment of Congress' unique obligation toward the Indians, such legislative judgments will not be disturbed." Id. at 555.

In applying Mancari, the Ninth Circuit has recognized that the Mancari standard and Congress' trust obligations apply to interests much broader than tribal self-government including the "right of individual Indian profit-making businesses to be free from state taxation; [the] right to fish; [and] imposition of federal rather than state law on Indians committing crimes on reservations." Alaska Chapter, 694 F.2d at 1168 (internal citations omitted).[58]

California's compacts with the tribes are rationally related to the furtherance of Congress' unique obligation to the tribes. IGRA was enacted for the purposes of "promoting tribal economic development, self-sufficiency, and strong tribal governments" as well as shielding tribal gaming from organized crime. 25 U.S.C. § 2702(1), (2). The compacts expressly incorporate these

---

[58]  In Williams, the Ninth Circuit also suggested that Mancari was limited to classifications "that affect uniquely Indian interests." Williams, 115 F.3d at 665. The court also offered the view in dicta that a monopoly on gambling accorded to Indians would not relate to unique Indian interests.
Even if Williams' interpretation were correct and Mancari is limited to "statutes that affect uniquely Indian interests," the compacts here would survive because by limiting such gaming to Indian land, they "give special treatment to Indians on Indian land." Id. at 665. If there is to be a more stringent "unique Indian interests" test for determining the standard of equal protection review, the development of such a test must await further guidance from the Ninth Circuit or the Supreme Court.

purposes, (Compact at Preamble F ("The State has a legitimate interest in promoting the purposes of IGRA.")), and similarly state that class III gaming constitutes a way to "enable the Tribe to develop self-sufficiency, promote tribal economic development, and generate jobs and revenues to support the Tribe's government and governmental services and programs." (Compact at 1.0(b)).  Further, the compacts note that "[t]he exclusive rights that Indian tribes in California, including the Tribe, will enjoy under this Compact create a unique opportunity for the Tribe to operate its Gaming Facility in an economic environment free of competition from . . . Class III gaming . . . on non-Indian lands in California."  (Id. at Preamble E).

Therefore, the compacts, entered into under IGRA, are designed to encourage tribes to become politically and economically self-sufficient while preserving tribal sovereignty and mitigating organized crime, all of which fit within the broad mandate of the federal government's trust obligation.  See Alaska Chapter, 694 F.2d at 1170 ("Encouraging and assisting Indian-owned businesses helps develop such leadership and furthers the government's trust obligation to help the Indians develop economic self-sufficiency."); St. Paul Intertribal Housing Bd. v. Reynolds, 564 F.Supp. 1408, 1413 (D. Minn. 1983) (noting broad scope of federal trust obligation to Indian tribes).  These objectives are "fundamental to the federal government's trust obligation with tribal Native Americans."

1 <u>Peyote Way Church</u>, 922 F.2d at 1216.[59]  Moreover, permitting

2 tribes with compacts to exercise exclusive class III gaming

3 rights on Indian land is rationally related to these objectives

4 and, therefore, to the furtherance of Congress' trust obligations

5 to the tribes.  See <u>Bd. of County Comm'rs of Creek County v.</u>

6 <u>Seber</u>, 318 U.S. 705 (1943) (upholding exclusive tax immunity for

7 certain Indians).  There is no dispute that by permitting tribes

8 to exercise gaming rights on Indian land free from non-tribal

9 competition, they are provided with a valuable economic benefit.

10 Further, it was rational for Congress to allow the states to

11 grant a tribal preference with respect to gaming, as opposed to

12 some other economic or entertainment activity, because at least

13 some tribes had already been engaged in gaming operations for the

14 purpose of raising revenue prior to enactment of IGRA.[60]  25

15 U.S.C. § 2701(1); <u>American Greyhound Racing</u>, 146 F.Supp.2d at

16

17     [59] Congress' decision to curtail tribal jurisdiction over

18 class III gaming by making such gaming contingent on state approval is consistent with the goal of furthering tribal

19 sovereignty.  (Pls.' Reply at 33).  Following <u>Cabazon</u>, individual states retained authority to ban all tribal gaming along with all

20 other gaming.  IGRA created a structure within which the interests of tribes that wished to game were balanced with the

21 interests of states in controlling crime.  Given that all tribal gaming could have been banned, it was rational for Congress to

22 further tribal sovereignty by balancing it against the interests of the states in regulating such gaming.

23     [60] It is of no consequence to the equal protection analysis

24 that tribal gaming involves substantial amounts of gaming by non-Indians.  (Pls.' Reply at 34).  Were <u>Mancari</u> subject to such a

25 limitation, many tribal preferences would fail because most commerce on Indian land is inextricably tied to non-Indian

26 persons and companies.  See <u>Alaska Chapter</u>, 694 F.2d at 1170 (noting congressional findings that most income generated on Indian land flows off-reservation).

1075.   For these reasons, the Secretary's approval of the compacts was rationally related to the furtherance of Congress' trust obligations and does not violate equal protection. California's negotiation and approval of the compacts, under an explicit delegation of congressional authority, is similarly within Congress' trust obligations and is consistent with equal protection.[61]   See <u>Washington v. Confederated Bands and Tribes of the Yakima Indian Nation</u>, 439 U.S. 463, 501 (1979) (state action in preference of Indian tribes falls under <u>Mancari</u> when passed "under explicit authority granted by Congress").

Plaintiffs argue that strict scrutiny must apply because (1) <u>Mancari</u> was overruled in <u>Adarand Constructors, Inc. v. Pena</u>, 515 U.S. 200 (1995); (2) <u>Mancari</u>'s deferential standard of review only applies to federal action while the compacts negotiated by California exceed the scope of Congress' delegation to the states; and (3) the compacts are racial classifications because they primarily benefit individual Indians.   These contentions fail.

_____

[61]   For this reason, plaintiffs' reliance on <u>Malabed v. North Slope Borough</u>, 42 F.Supp.2d 927 (D. Alaska 1999) is misplaced.   The tribal preference at issue in that case was not passed in response to an explicit delegation of congressional authority.   <u>Id.</u> at 939 ("[North Slope Borough] has no constitutional mandate to promote Indians' interest.").   Further, the preference, which favored native Alaskans, was enacted by a municipal body that was "overwhelmingly composed of Inupiat Eskimos," and therefore raised the specter of "a majority arrogat[ing] to itself special privileges and rights otherwise denied to similarly-situated members of the minority."   <u>Id.</u> at 940.   By contrast, having been approved by California's voters, Governor, Legislature, and the federal government, if the compacts lack for anything, it is surely not approval from the public and its elected officials.

1      First, although there has been some comment in the case law
2  about the impact of Adarand on Mancari, the Supreme Court did not
3  overturn Mancari, and the majority opinion in Adarand never even
4  mentions Mancari by name.  See id. at 244.  No lower court has
5  held that Mancari was overruled by Adarand.  Therefore, until a
6  higher court finds that Mancari has been overturned by the
7  Supreme Court, it is controlling.  See Rice v. Cayetano, 146 F.3d
8  1075, 1081 n.17 (9th Cir. 1998)(overruled on other grounds Rice
9  v. Cayetano, 528 U.S. 495 (2000)); American Greyhound Racing, 146
10  F.Supp.2d at 1077 ("In these circumstances, the court must follow
11  Mancari as the directly controlling case, for the Supreme Court
12  reserves to itself the prerogative to find its opinions
13  implicitly overruled by changing doctrine.").  Moreover, while
14  the regulation addressed in Adarand extended preferences to
15  "Native Americans," Adarand, 515 U.S. at 205, both IGRA and the
16  compacts address themselves to Indian tribes as sovereign
17  entities.  25 U.S.C. § 2710(d)(1)(C) (noting that class III
18  gaming requires a compact entered into by an Indian tribe);
19  Compact at 1 (noting that compact is entered into between the
20  State of California and a "federally-recognized sovereign Indian
21  tribe").  For these reasons, IGRA and the compacts here do not
22  implicate Adarand's requirement of strict scrutiny for all racial
23  classifications.

24      Plaintiffs' second argument is that strict scrutiny applies
25  because California's compacts violate IGRA and states may only
26  avail themselves of the Mancari standard when they act "under

1  explicit authority granted by Congress."[62]  Washington v.
2  Confederated Bands and Tribes of the Yakima Indian Nation, 439
3  U.S. 463, 501 (1979).  Because the compacts provide for
4  assessments in excess of "such amounts as are necessary to defray
5  the costs of regulating such activity," 25 U.S.C. §
6  2710(d)(3)(C)(iii), plaintiffs argue that California exceeded the
7  authority delegated to the states in IGRA and, therefore, the
8  exclusive class III gaming rights for tribes must survive strict
9  scrutiny.  (Pls.' Motion at 38-41).  In essence, the plaintiffs
10  seek to litigate the validity of the assessment provisions of the
11  compacts within the confines of their argument about the level of
12  scrutiny the court should apply to the question of equal
13  protection.

14      This strained argument fails among other reasons because
15  plaintiffs lack standing to challenge the compacts' assessment
16  requirements, even within the context of their assault on equal
17  protection.  "[T]he plaintiff generally must assert his own legal
18  rights and interests, and cannot rest his claim to relief on the

20  [62]  Plaintiffs also contend that strict scrutiny applies
because Congress was neutral with respect to whether the states
21  would allow tribes to offer class III gaming, and, therefore,
Congress did not affirmatively direct the states to adopt a
22  specific policy in favor of class III gaming by the tribes.
(Pls.' Reply at 25-26).  But Congress intended at least to
23  facilitate tribal gaming while balancing the sovereign interests
of states and tribes.  Moreover, it is not the case that Congress
24  must mandate a particular type of state action, as opposed to
merely allowing it, before a state may implement a tribal
25  classification that will be evaluated under Mancari.  The
classification upheld in Washington v. Confederated Bands and
26  Tribes of the Yakima Indian Nation, 439 U.S. 463, 473-74 (1979),
permitted, but did not require, certain states to assume civil
and criminal jurisdiction over Indian land.

1  legal rights or interests of third parties."  Warth v. Seldin,
2  422 U.S. 490, 499 (1976).  It is the tribes which have or are
3  seeking compacts, rather than their competitors, who are the
4  proper parties to challenge the assessment provisions because
5  they are the ones who are directly injured by any such violation
6  of IGRA.[63]  Nor is there any obstacle that prevents Indian tribes
7  from litigating such claims.  See Powers v. Ohio, 499 U.S. 400,
8  411 (1991) (noting that one requirement for exercise of third
9  party standing is that "there must exist some hindrance to the
10  third party's ability to protect his or her own interests").  The
11  limitation on third party standing -- the Supreme Court has
12  referred to it as a "matter[] of judicial self-governance" -- is
13  no less relevant when encapsulated within an argument about the
14  standard of review under the Equal Protection Clause.  Warth, 422
15  U.S. at 500.  To the contrary, it is especially apt in this case
16  where the focus of the litigation is on decidedly different
17  issues and would require the court to consider a side dispute on
18  the meaning of an entirely separate provision of IGRA.  The court
19  finds that the provisions of the compacts at issue here, the
20  permission to engage in class III gaming, was based on authority
21  delegated by the federal government.  See Confederated Bands and
22  Tribes of the Yakima Indian Nation, 439 U.S. at 501 (holding that

23  _____

24      [63]   Even if the court were to address the merits of the
    plaintiffs' arguments about the assessment provisions, there is
25  no reason to believe that a different outcome would be
    forthcoming than the one reached in In re Indian Gaming Related
26  Cases, 147 F.Supp.2d 1101 (N.D. Cal. 2001), where the district
    court held that the compacts' assessment provisions did not
    violate IGRA.

1  Mancari applied to state regulation of Indian tribes enacted in

2  response to specific delegation of authority by Congress to the

3  state).[64]

4  Finally, the equal protection analysis does not change

5  merely because it may be that some, or even most, of the monetary

6  benefits of class III gaming inure to individual Indians rather

7  than the tribes.  (Pls.' Reply at 22).  As Mancari illustrates, a

8  tribal preference is not transformed from a political to a racial

9  classification that requires strict scrutiny merely because the

10  vehicle for the preference consists of individual members of

11  tribes.  The BIA hiring preference upheld in Mancari explicitly

12  targeted individual Indians but was still considered a political

13  classification that merited deferential review.  Mancari, 417

14  U.S. at 554.  Moreover, it cannot fairly be said that a

15  preference which aids individual members of Indian tribes is not

16  rationally related to Congress' trust obligation to the tribes.

17  Individual members are benefitted not because they are Indian per

18  se but because they are members of tribes that have entered into

19  compacts and distributed the resulting income to their members.

20  A contrary holding would both distort Mancari and hamstring the

21  political branches in the exercise of their trust obligation to

22

23  [64]  For this reason also, there is no equal protection
24  violation under count IV which seeks to enjoin enforcement of
   California's Penal Code prohibitions against class III gaming by
25  the plaintiffs.  Following authority specifically delegated to it
   by Congress, California exempted Indian tribes from otherwise
26  generally applicable laws prohibiting class III gaming.  This
   benefit to Indian tribes is evaluated under Mancari and is
   consistent with the Equal Protection Clause.

1  the Indian tribes.[65]

2  ## IX.  Conclusion

3      This case has presented complex and novel issues relating to
4  federal jurisdiction, IGRA, and equal protection.  The issues
5  have been ably briefed and argued by the parties and various
6  amici.  The legal issues presented reflect the significance of
7  the difficult public policy choices made by the Secretary, the
8  Governor, and the State of California relating to gambling.
9  Those choices may be wise or unwise.  The grant of an economic
10 monopoly to any group presents serious questions that should
11 cause careful consideration and hesitation.  In a strong
12 democratic system, in which the proponents and opponents of
13 Indian gaming, and gambling more generally, can be heard, these
14 important questions can continue to be evaluated and debated in
15 the light of experience and future developments.  These matters
16 of social policy are not ones for the court to resolve but are
17 properly left for resolution by the political branches and the
18 electorate.  Where the political branches and the people of
19 California have adopted a policy that does not violate either

20

21  [65] Plaintiffs also contend that the compacts constitute
22  racial preferences because tribal membership depends, at least in
    part, on race.  (Pls.' Reply at 22 n.14).  Even if true, strict
23  scrutiny does not apply under the case law.  Mancari illustrates
    this point, as the BIA hiring preference only applied to persons
24  who were "one-fourth or more degree Indian blood and . . . a
    member of a Federally-recognized tribe."  Mancari, 417 U.S. at
25  554 n.24; see also Alaska Chapter, 694 F.2d at 1168 ("If the
    preference in fact furthers Congress' special obligation, then *a*
26  *fortiori* it is a political rather than racial classification,
    even though racial criteria might be used in defining who is an
    eligible Indian.").

1  federal law or the United States Constitution, that policy is
2  entitled to prevail.

3      For the foregoing reasons, the plaintiffs' motion with
4  respect to IGRA, the Equal Protection Clause, and the Due Process
5  Clause is DENIED and the motions of the state and federal
6  defendants are GRANTED.  As to standing, the state defendants'
7  motion is GRANTED as to (1) the Governor and future compacts
8  under count II; (2) the Commission and the Director under count
9  II; (3) the Governor under count III; and (4) the Commission
10  under count IV, but is DENIED as to (1) the Governor as to the
11  existing compacts and count II; and (2) the Attorney General and
12  the Director under count IV.  As to Ex parte Young and § 1983,
13  the state defendants' motion is GRANTED as to (1) the Commission
14  and the Director under count II; and (2) the Commission under
15  count IV, but is DENIED as to (1) the Governor under count II;
16  and (2) the Attorney General and the Director under count IV.
17  With respect to the APA, the federal defendants' motion is
18  DENIED.  The motion to dismiss for failure to join necessary and
19  indispensable parties is DENIED.

20      Judgment shall enter for defendants.

21      IT IS SO ORDERED.

22

23  Dated:  29 July 2002  .
24
25                                       DAVID F. LEVI
26                                       United States District Judge

United States District Court
for the
Eastern District of California
July 29, 2002


* * CERTIFICATE OF SERVICE * *


2:01-cv-00248


Artichoke Joe's

    v.

Gale A Norton

---

I, the undersigned, hereby certify that I am an employee in the Office of
the Clerk, U.S. District Court, Eastern District of California.

That on  July 29, 2002, I SERVED a true and correct copy(ies) of
the attached, by placing said copy(ies) in a postage paid envelope
addressed to the person(s) hereinafter listed, by depositing said
envelope in the U.S. Mail, by placing said copy(ies) into an inter-office
delivery receptacle located in the Clerk's office, or, pursuant to prior
authorization by counsel, via facsimile.


      Richard W Nichols              HV/DFL
      McDonough Holland and Allen
      555 Capitol Mall             VC/GGH
      9th Floor
      Sacramento, CA  95814

      Robert V Zener
      PRO HAC VICE
      Swidler Berlin Shereff Friedman LLP
      3000 K Street NW
      Suite 300
      Washington, DC  20007

      James Hamilton
      PRO HAC VICE
      Swidler Berlin Shereff Friedman LLP
      3000 K Street NW
      Suite 300
      Washington, DC  20007

      Robert D Links
      Berger Nadel and Vannelli
      650 California Street
      25th Floor
      San Francisco, CA  94108

Alan Jay Titus
Robert R. Yokum
591 Redwood Highway
Suite 2250
Mill Valley, CA  94941

Michael V Franchetti
Franchetti and Rystrom
331 J Street
Suite 200
Sacramento, C  95814

David Michael Fried
Law Offices of David M Fried
214 Grant Ave
Suite 400
San Francisco, CA  94108

Edmund F Brennan
United States Attorney
501 I Street
Suite 10-100
Sacramento, CA  95814

Marc A Le Forestier
Attorney General's Office
PO Box 944255
1300 I Street
Suite 125
Sacramento, CA  94244-2550

Richard G McCracken
Davis Cowell and Bowe
100 Van Ness Avenue
20th Floor
San Francisco, CA  94102

Frank R Lawrence
Holland and Knight LLP
633 West Fifth Street
Suite 2100
Los Angeles, CA  90071

Fred James Hiestand
Law Offices of Fred J Hiestand
1121 L Street
Suite 404
Sacramento, CA  95814

Jack L. Wagner, Clerk

BY: _____
      Deputy Clerk